IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 97-40854
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JUAN FELIPE GARCIA,

Defendant-Appellant.

*******************************************************************

_____

No. 97-40855
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL ANGEL GARCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 21, 1999

Before JOLLY, BARKSDALE, and BENAVIDES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Michael Garcia and Juan Garcia pleaded guilty to conspiracy to possess, and actual possession with the intent to distribute, over 100 kilograms of marijuana in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846. They entered their guilty pleas after an adverse hearing on a motion to suppress evidence, including their confessions. The defendants

conditioned their guilty pleas, however, preserving their right to appeal the denial of their motion. Thus, the only issue on appeal is whether the district court erred in refusing to suppress the evidence. We conclude that officials did not violate the defendants' Fourth Amendment rights, that the district court did not err in denying their motion to suppress, and that their convictions must be affirmed.

I

The parties do not dispute the relevant facts. The defendants first encountered Border Patrol agents when they emerged from the end of a dirt trail in Hebronville, Texas, at 11:15 P.M. This occasion was not, however, the first time that the agents knew of the defendants' presence on the trail. The defendants had set off sensors, located at several points along the trail, earlier in the evening.

The Border Patrol had placed sensors on this trail because the agents knew the trail frequently was used by drug smugglers. According to testimony given by a Border Patrol agent, the trail provided a convenient route for drug smugglers because it allowed them to circumvent the Border Patrol's nearby roadside checkpoint. On multiple occasions in the months preceding the defendants' arrests, Border Patrol agents learned of drug smuggling instances along the trail. Sometimes the agents caught the smugglers. Other times, the agents simply discovered drugs stashed in the brush around the trail. In the course of these

events, the agents  learned that the smugglers would typically use heavy backpacks to transport the drugs.  The Border Patrol agents attempted to enhance their effectiveness in patrolling the area by placing sensors along the known drug route.

When these sensors alerted to activity on the evening the defendants were arrested, Border Patrol agents went to the location of the sensors.  There they discovered several footprints, left in the dirt, bearing distinctive markings from the soles of what the agents later learned were the defendants' shoes.  The agents also noted that these footprints were deep, indicating that  the persons creating them either carried something heavy or that those persons were themselves heavier than average.  The agents attempted to follow the footprints, hoping to catch up with the persons who had made them.

Although the agents traveling by foot on the trail never caught up to the defendants, another agent (who had been informed of the sensor alert) waited in his patrol vehicle at the end of the trail.  When the defendants emerged from the trail, they began walking down a street adjacent to the trail's exit.  After allowing the defendants to walk for less than one block, the agent in the patrol car began to approach the defendants.  The defendants then saw the patrol vehicle and immediately ducked into the porch of a house along the road.  The agent (Agent Charles) left his vehicle and found the defendants hiding in the shadows of the porch.

After Agent Charles--still some distance from the defendants--began to ask them questions, the defendants approached him.  During the ensuing conversation, the defendants were evasive and appeared nervous.  Agent Charles first asked the defendants what they were doing.  Juan Garcia answered by saying that they were visiting a cousin who lived in the house.  Shortly after Agent Charles made contact with the defendants, Agent Chavez arrived on the scene.  After he arrived, Agent Chavez also asked the defendants what they were doing.  Juan told this agent that they were out hunting.  The defendants, however, had no hunting gear and it was not hunting season.  The agents also asked the Garcias where they had come from.  Juan replied that they had come from his house and he pointed in the relevant direction.  Agent Charles, however, had seen the defendants come from a different direction.  The agents also asked the defendants to show them the bottoms of their shoes.  The soles of their shoes were identical to the markings made on the trail near the sensors.  Finally, the agents asked Juan if they could look at his shoulders.  Juan agreed and the agents saw fresh bruising on his shoulders in the pattern of strap marks that a heavy backpack would leave.  After hearing the defendants' answers and seeing the bruises, Agent Chavez concluded that the defendants had probably been smuggling narcotics along the trail.

Agent Chavez then took the defendants to the nearby checkpoint station.  Agent Perez was the only agent manning this

station and he conducted traffic through the checkpoint as part of his duties that night.  Agent Chavez told Agent Perez that he would be leaving the defendants at the checkpoint while he, Agent Chavez, left to help several other officers search the trail for the drugs.  The two agents then read the defendants their Miranda rights and placed them into separate holding cells.  Agent Chavez left.  Within a few minutes, and after Agent Perez had asked the defendants if they knew anything about the drugs, Michael confessed and said that he would help the agents locate the drugs.  Soon after, Juan also agreed to help the agents locate the drugs.  The agents and the defendants eventually found that drugs sometime between 1:00 A.M. and 1:30 A.M.

## II

At the suppression hearing, the defendants argued that the Border Patrol agents did not have probable cause to arrest at any time before the defendants gave their confessions.  Furthermore, they argued that their Fourth Amendment rights were violated when the agents placed them in the holding cells because that confinement did not constitute a reasonable detention under Terry v. Ohio, 392 U.S. 1 (1968), and its progeny.  The defendants contended that their confessions and agreements to aid in locating the drugs were the direct result of the unconstitutional seizure of their persons.  Therefore, they argued, the evidence of their confessions and the drugs should be suppressed.

5

The district court disagreed. The court concluded that it was reasonable to place the defendants in the holding cells as part of an investigatory detention, not rising to an arrest. Although the court noted that the case presented a close call, it concluded that a temporary detention was warranted in this case because of the entirely warranted reasonable suspicion that the defendants had smuggled narcotics, and because the agents needed time to sweep the area for drugs. Therefore, the court concluded that the defendants were not, <u>de facto</u>, under arrest without probable cause at the time they gave their confessions.

### III

We conclude that the district court did not err in denying the defendants' motion to suppress the evidence. In our view, however, the denial was correct because the agents had probable cause to arrest the defendants at the time they transported them to the checkpoint. Thus, even if the decision to place the defendants in the holding cells constituted a <u>de facto</u> arrest, probable cause warranted that arrest. In coming to these conclusions, we review the district court's findings of fact for clear error. <u>United States v. Ramirez</u>, 145 F.3d 345, 352 (5th Cir. 1998). We review the application of those facts to the relevant Fourth Amendment standards <u>de novo</u>. <u>Id.</u>[1]

---

[1] We may, of course, affirm the judgment of the district court for reasons other than those given or relied on below. <u>See, e.g.</u>, <u>Terrell v. University of Texas System Police</u>, 792 F.2d 1360, 1362 n.3 (5th Cir. 1986). In drawing our legal conclusion that probable cause existed before the agents placed the defendants in holding cells, we have accepted all of the district court's factual findings. The

We begin with a word about the relevant law. We have long known that law enforcement officials may arrest an individual in a public place without a warrant if they have probable cause to believe that the individual committed a felony. See, e.g., United States v. Watson, 423 U.S. 411, 423-24 (1976). "Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." United States v. Wadley, 59 F.3d 510, 512 (5th Cir. 1995). When considering what a "reasonable person" would have concluded, we take into account the expertise and experience of the law enforcement officials. See, e.g., United States v. Ortiz, 422 U.S. 891, 897 (1975).

It is almost a tautology to say that determining whether probable cause existed involves a matter of probabilities, but it nevertheless fairly describes the analysis we undertake. Brinegar v. United States, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."); Hart

---

district court did not clearly err in making any of those findings.

v. O'Brien, 127 F.3d 424, 444 (5th Cir. 1997) (stating that probable cause requires "a showing of the probability of criminal activity"), cert. denied, 119 S.Ct. 868 (1999).  "The probable cause issue must be analyzed under the 'totality of the circumstances' as to whether there is a 'fair probability' that a crime occurr[ed]."  United States v. Antone, 753 F.2d 1301, 1304 (5th Cir. 1985) (quoting Illinois v. Gates, 462 U.S. 213 (1983)).[2]

A "fair probability" does not mean that a reasonable official would have thought it more likely than not that the defendant committed a felony.  United States v. Adcock, 756 F.2d 346, 347 (5th Cir. 1985) (per curium); Antone, 753 F.3d at 1304. Although the "fair probability" must certainly be more than a bare suspicion, see Brinegar, 338 U.S. at 175, our court has rejected the notion that the government must show that a reasonable person would have thought, by a preponderance of the evidence, that a defendant committed a crime.  Antone, 753 F.2d at 1304; Adcock, 756 F.2d at 347.[3]  In short, the requisite "fair

---

[2]In discussing the appropriate legal standard under which a court should determine if probable cause existed, we have taken note of the fact that

> the function of arrest is not merely to produce someone in court for prosecution but also to enable a police officer who believes that the person has committed a crime to complete his investigation . . . .

United States v. Raborn, 872 F.2d 589, 593 (5th Cir. 1989).

[3]At one point, we did quote an opinion of the Ninth Circuit that stated,

probability" is something more than a bare suspicion, but need
not reach the fifty percent mark.

B

After thoroughly reviewing the record, we have no doubt that
a reasonable officer would have found it a "fair probability"
that the defendants had smuggled drugs.  At the time Agent Chavez
took the defendants to the checkpoint, the following facts were
known to the agents:  the defendants had just traveled along a
trail notorious for drug smuggling; the defendants took their
journey during the dark hours of the night; the defendants'
footprints indicated that they were carrying something heavy and
at least one of the defendants had bruising on his shoulders
consistent with the known modus operandi of past drug smugglers;
when the defendants first saw a Border Patrol agent approach,
they attempted to hide; upon questioning by agents, the
defendants seemed evasive and nervous; and the defendants

---

> The test is whether ordinarily, reasonable men, possessed of the experience and knowledge
> of (the arresting officers) would conclude that the transaction . . . was more likely than not
> a criminal transaction.

United States v. Tinkle, 655 F.2d 617, 622 (5th Cir. 1981) (quoting United States v. Bernard, 607
F.2d 1257, 1266-67 (9th Cir. 1979)).  In Antone, however, we rejected this standard and we relied
on an intervening Supreme Court decision in doing so.  See Antone, 753 F.2d at 1304 (relying upon
Texas v. Brown, 460 U.S. 730 (1983)).  Thus, our decision in Antone is the binding precedent.  See
also United States v. Burrell, 963 F.2d 976, 986 (7th Cir. 1992) ("Probable cause requires more than
bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a
showing that the officer's belief is more likely true than false.");  United States v. Cruz, 834 F.2d 47,
50 (2d Cir. 1987) ("In order to establish probable cause, it is not necessary to make a 'prima facie
showing of criminal activity' or to demonstrate that it is more probable than not that a crime has been
or is being committed.").  Compare United States v. Raborn, 872 F.2d 589, 593 (5th Cir. 1989)
(stating that the standard is unsettled in our circuit).

9

responded to the agents' questions with obviously false and inconsistent explanations.

The question we must address is whether Agent Chavez reasonably believed that there was a fair probability that the defendants had smuggled drugs.[4] Although each of the facts just listed may not, when standing alone, provide sufficiently incriminating evidence, the coincidence of all these facts surely would alert the reasonable Border Patrol agent to a fair probability of drug smuggling. See Hart, 127 F.3d at 444 (stating that probable cause may exist even though officers have observed no unlawful activity). The defendants did not supply the Border Patrol agents with a truthful explanation for their unusual activity--i.e., traveling along a known drug trail during the dark hours of the night--and the agents testified that they knew of no legitimate reason for being on this trail at night.[5] See id. at 444 ("The observation of unusual activity for which there is no legitimate, logical explanation can be the basis for probable cause.") (quoting United States v. Alexander, 559 F.2d 1339, 1343 (5th Cir. 1977)). We therefore conclude that the Border Patrol agents had probable cause to arrest Juan and Michael Garcia before they were placed in the holding cells.

IV

---

[4]The test is an objective one, see, e.g., United States v. Cooper, 949 F.2d 737, 744 (5th Cir. 1991), but we also consider the agent's knowledge and experience, see, e.g., id. at 745.

[5]The trail ran through two private ranches.

For the foregoing reasons, we find that the district court did not err in denying the defendants' motion to suppress the evidence in this case.  The judgment of the district court is

A F F I R M E D.

BENAVIDES, Circuit Judge, dissenting:

I dissent from the majority's decision because I disagree with their conclusion that the border patrol agents had probable cause to arrest Michael and Juan Garcia before Michael Garcia confessed at the checkpoint station. In finding probable cause, the majority both contravenes precedent in this Circuit and establishes a threshold for arrest that threatens to eviscerate protections afforded by the Fourth Amendment.

When the Garcias were taken into custody, the border patrol agents were aware of only two potentially incriminating facts. First, the Garcias had just left a trail sometimes used by drug traffickers, and they provided the agents with inconsistent statements about that fact. Second, one of the Garcias might have been carrying something at some point along the trail, as evidenced by bruises on one of their shoulders and some deep footprints found along the trail. Although these two facts legitimately raised suspicion, I do not find them sufficient to establish probable cause. In none of the cases cited by the majority or the government was probable cause for a drug-related arrest founded on such scant information. In each of those cases, extremely suspicious behavior was combined with at least some evidence indicating the existence and whereabouts of drugs. See United States v. Adcock, 756 F.2d 346, 347 (5th Cir. 1985) (probable cause based in part on cocaine found on a person who had just exited the suspect's house); United States v. Antone, 753 F.2d 1301, 1304 (5th

12

Cir. 1985) (probable cause based in part on an informant's tip concerning the location of marijuana and the smell of marijuana from a suspect's vehicle); United States v. Harlan, 35 F.3d 176, 179 (5th Cir. 1994) (probable cause based in part on a "visible large bulge," presumed to be cocaine, in the suspect's jacket); United States v. Piaget, 915 F.2d 138, 140 (5th Cir. 1990) (probable cause based in part on the transfer between the suspects of a gray canvas bag which was presumed to contain narcotics); United States v. Willis, 759 F.2d 1486, 1495 (5th Cir. 1985) (probable caused based, in part, on stuffed duffel bags, presumed to contain cocaine, in the passenger area of a private luxury passenger plane).  In this case, the border patrol agents had no physical evidence suggesting that the Garcias possessed any narcotics.  While it was reasonable for the border patrol to suspect that the Garcias had hidden marijuana somewhere in the brush, such conjecture does not constitute probable cause to make an arrest.  Only once Michael Garcia's admission to Agent Perez substantiated that conjecture did the border patrol have probable cause to place the Garcias under arrest.

Instead of stretching the facts of this case to eke out a basis for probable cause, I would have this court review the decision of the district court on the grounds on which it was decided.  The district court found that the temporary detention of the Garcias in a jail cell was lawful under Terry v. Ohio, 392 U.S. 1 (1968), based solely on the border patrol agents' reasonable

13

suspicion that criminal activity was afoot. Thus, the district court found that when the Garcias were placed in holding cells, they were not arrested but only reasonably detained. Although several Courts of Appeals have, on the basis of reasonable suspicion, sanctioned less drastic uses of force, see, e.g., United States v. Sanders, 994 F.2d 200, 206 (5th Cir. 1993) (allowing use of handcuffs on the basis of reasonable suspicion), none have yet considered whether detaining a suspect in a cell necessarily exceeds the limits on investigatory detentions prescribed by Terry and its progeny. Rather than help elucidate this area of unsettled law, the majority elects to muddle the previously settled protections afforded citizens under the Fourth Amendment. I dissent.