UNITED STATES of America,

v.

Daniel TUDORAN, Defendant.

No. 1:06–CR–360 (GLS).

United States District Court,
N.D. New York.

March 8, 2007.

Glenn T. Suddaby, United States Attorney, of Counsel, Edward P. Grogan Assistant U.S. Attorney, Albany, NY, for United States.

Kindlon, Shanks Law Firm, of Counsel, Kent B. Sprotbery, Esq., Albany, NY, for Defendant.

### *Memorandum–Decision and Order*

SHARPE, District Judge.

## I. *Introduction*

Daniel Tudoran has been indicted for falsely claiming United States citizenship, immigration fraud and entry without inspection. *See* 18 U.S.C. §§ 911, 1546(a); 8 U.S.C. § 1325. He moved to suppress statements he made to border authorities, alternatively arguing that they were obtained in violation of his *Miranda* rights (Fifth Amendment Self–Incrimination Clause), and that they were involuntary (Fifth Amendment Due Process Clause). *See* Dkt. Nos. 12, 15; FED.R.CRIM.P. 12(b)(3)(C); *see also U.S. v. McFarland,* 424 F.Supp.2d 427, 433–437 (N.D.N.Y. 2006) (distinguishing Fifth Amendment claims). Following a suppression hearing, the parties supplemented their initial submissions. *See Gov't Supp. Memo.,* Dkt. No. 20; *Tudoran Reply,* Dkt. No. 21.

The court has numbered Tudoran's statements as "One–Six." During the hearing, he withdrew his motion as to Statements One and Six, and the court now considers the admissibility of Statements Two–Five. For the reasons that follow, the motion to suppress is denied as to Statements Two and Three and granted as to statements Four and Five.

## II. *Facts*

The essential facts are based on an evaluation of the following: the applicable burden of proof; the testimony of Department of Homeland Security Customs Border

Protection Officers Wrye, Siskavich, Durant, Traistaru and Aubrey; Tudoran's non-testimonial affidavit; hearing exhibits; the parties' submissions; and the resolution of credibility issues. *See* FED. R.CRIM.P. 12(d); *see also U.S. v. Miller,* 382 F.Supp.2d 350, 361–63 (N.D.N.Y.2005) (burden of proof).

At approximately 12:30 A.M. on September 4, 2006, Gabriel Gheorghiu, a United States citizen, entered the primary inspection lane at the Champlain Port of Entry located on the United States–Canadian border. Gheorghiu, who was alone, was operating a Canadian vehicle registered to Daniel Tudoran. Gheorghiu told primary inspector Traistaru that Tudoran was a friend of his from Montreal, and that he was delivering the car to New York City because Tudoran had been delayed there on business. Traistaru referred Gheorghiu to the secondary building for further inspection.[1] The secondary building was located a few hundred feet from the primary inspection station.

During the hearing, Traistaru was not asked about other statements made by Gheorghiu during the encounter at primary. Nonetheless, the court concludes from its review of Traistaru's report, *see Ex. D–1,* that Gheorghiu said that Tudoran was from Montreal and had paid him $500 to drive his car to New York City.

During secondary inspection, officers discovered counterfeit documents and suspicious items in the car and its contents, including: multiple U.S. identity documents bearing different names, but the same photograph; an altered green card; a scanner capable of surreptitiously recording credit card numbers; and a laptop computer capable of generating counterfeit credit cards. Given those discoveries, Gheorghiu was detained at secondary for two and one-half hours until 3:00 A.M.

Gheorghiu's lengthy detention occurred because he was a U.S. citizen, and the officers could not deny him admission. However, the Canadian-registered car contained potential evidence of criminal activity. Despite calls to other agencies with primary jurisdiction over such activity, no agency agreed to respond and investigate. Accordingly, the officers prepared to release Gheorghiu to return the car to Canada. Before they did, however, the plot thickened.

At 2:50 A.M., Officers Wrye, Siskavich and Johnston were working a cargo detail a short distance from the secondary building and within visual distance of a separate cargo building. At the time, the area east of the cargo building and the Port of Entry itself was under construction, and the ground was muddy.

As they were inspecting cargo, Wrye and Siskavich noticed a man smoking a cigarette and talking on a cell phone while standing in a restricted area outside the cargo building. Wrye left his inspection duties to confront the man, and Siskavich and Johnston followed shortly thereafter. Wrye asked the man what he was doing there. The man identified himself as Daniel Tudoran, and told Wrye that he was having a bad day with his girlfriend. Tudoran related that he and his girlfriend were at the duty free station located on the U.S. side of the border, and she left him there. He also said that she was doing a U-turn in Canada and was re-

---

1. Witnesses used different nomenclature when referring to this building. The court uses the term, "secondary building." The building is open to the public and is a multipurpose structure. It is used for secondary immigration and customs inspections; it has a public foyer and restrooms; and it has offices, interrogation areas and detention areas. The building is part of a complex of structures and areas that comprise the Champlain Port of Entry.

turning to get him. Because Tudoran spoke with an accent, Wrye inquired about his country of origin, and Tudoran said he was Romanian.

When the other two officers arrived, Johnston noticed that Tudoran's clothes were muddy and asked him about it. Tudoran explained that his girlfriend pushed him into the mud. In response to a question from Siskavich, Tudoran said he was born in New York City. Wrye then told Siskavich that Tudoran told him that he was born in Romania, and Siskavich asked Tudoran for identification. Tudoran provided a New York driver's license which Siskavich retained. When Siskavich informed him that a driver's license was inadequate proof of citizenship, Tudoran produced a Canadian medical card. The three officers then escorted Tudoran to the secondary inspection station located in the main lobby of the secondary building. The entire encounter lasted ten minutes, and Tudoran was never advised of his *Miranda* rights. Tudoran's temporary detention and questioning were consistent with routine procedures to ascertain his immigration status. Collectively, the statements to Wrye, Siskavich and Johnston constitute "Statement One."

Inside the secondary building, Officer Durant was working as the secondary inspection supervisor. When Tudoran arrived in the lobby, he immediately recognized him from photographs on documents retrieved from the Gheorghiu vehicle. Durant retrieved Tudoran's driver's license from Siskavich, and he recognized Tudoran's name as the registered owner of the Gheorghiu vehicle. In a conversational tone, he then asked Tudoran questions while the two were standing at a counter in the lobby. Tudoran stated that he was a U.S. citizen born in New York City but raised in Romania. He also stated that he was eligible for a U.S. passport, that he had traveled on one in the past, and that

he did not have it with him. (Collectively, "Statement Two.")

Earlier, Traistaru left his primary post after referring Gheorghiu to secondary. He then assisted with the inspection of Gheorghiu's vehicle and its contents. Inside a suitcase, he discovered a green card that he believed had been altered. Thereafter, he was in the lobby of the secondary building when he saw Tudoran walk in, and he recognized Tudoran from the photograph on the fake green card. Immediately following the conversation between Durant and Tudoran (Statement Two), Traistaru took Tudoran to an exterior window where he could see the Gheorghiu vehicle. Traistaru twice asked Tudoran if the vehicle was his, and Tudoran twice denied ownership. Traistaru then pointed to Gheorghiu who was standing in the lobby and asked Tudoran if he knew him. Tudoran responded, "no." Traistaru then retrieved the illegal green card and showed it to Tudoran. When confronted with the card, Tudoran looked at it, smiled, and said, "you guys are good." (Collectively, "Statement Three.")

Traistaru then left Tudoran, and confronted Gheorghiu. When Gheorghiu saw Tudoran, he admitted that he had dropped Tudoran off before primary inspection and had intended to pick him up afterwards. Apparently, Traistaru did not ask Gheorghiu why he had dropped Tudoran off, and there was no conversation about Tudoran's citizenship.

Immediately thereafter, Johnston moved Tudoran to a room adjacent to the lobby, searched his person, retrieved items from his clothing, and handcuffed him. Traistaru then entered the room and noticed a counterfeit social security card that had been retrieved from Tudoran's person. Traistaru confronted Tudoran with the social security card and asked him "what's going on?" Tudoran responded that he

had nothing to say but that he was in the country legally and had a valid social security card. He told the officers that if they ran the card, they would find that he was in the country legally. Tudoran then saw Traistaru's name tag and asked if he was Romanian. When Traistaru responded that he was, Tudoran said, "then, why are you doing this to me?" (Collectively, "Statement Four.") Neither Traistaru nor any other officer had yet advised Tudoran of his *Miranda* rights. All of the conversations between Traistaru and Tudoran were conversational in tone and cordial.

At 7:00 A.M., Officer Aubrey arrived for work and learned of Tudoran's detention. He proceeded to the room adjacent to the lobby, uncuffed Tudoran who had been handcuffed to a bench for approximately three and one-half hours, and took him to his office. According to Aubrey, he first completed the "secondary inspection" by asking Tudoran his alienage. Tudoran admitted that he was a Romanian citizen and had entered the United States without inspection. He told Aubrey that because of his marriage to a U.S. citizen, he was under "adjustment of status," meaning that he was in the process of becoming a permanent resident alien ("Statement Five").

Subsequently, Aubrey checked immigration databases. He discovered that Tudoran had once been under adjustment of status but had since been denied. He then formally arrested Tudoran, advised him of his *Miranda* rights at 8:00 A.M., and when Tudoran requested an attorney, Aubrey ceased what he termed, "further interrogation." He did, however, ask further questions to elicit what he called "pedigree information," which included statements by Tudoran concerning his name, citizenship, country and date of birth ("Statement Six"). *See Gov't Ex. 5.*

During the hearing, Tudoran conceded that no statements made by him before he entered the lobby of the secondary building were subject to suppression either because they were involuntary or otherwise resulted from a *Miranda* violation. (Statement One). Furthermore, Government Exhibit 5 was redacted to reflect the substance of the pedigree information, and Tudoran withdrew his motion as to Statement Six.

In support of his motion, Tudoran submitted a sworn affidavit asserting that he was not *Mirandized* before questioning and that he answered questions only because he was intimidated. He did not testify at the suppression hearing. The court discredits his claims of intimidation. *See Miller,* 382 F.Supp.2d at 362–63.

Given the entirety of the circumstances of the encounter between Tudoran and the officers as those circumstances relate to the officers' conduct, the conditions of the questioning, and Tudoran's characteristics, there is no evidence that Tudoran was coerced to speak. No officer threatened Tudoran, lied to him, used psychological or physically coercive tactics, or otherwise made promises to induce him to speak. Although no *Miranda* warnings were administered before Aubrey did so, there was no police overreaching or coercive conduct.

### III. *Analysis*

#### A. *Miranda, Custodial Interrogation and the Border*

Once in custody, a suspect may not be interrogated unless he is advised of his *Miranda* rights, he demonstrates that he understands them, and he voluntarily waives them, either explicitly or implicitly. *See Yarborough v. Alvarado,* 541 U.S. 652, 661–63, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004); *Thompson v. Keohane,* 516 U.S. 99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). *Miranda* applies only if two preconditions exist; namely, custody and in-

terrogation. *See McFarland,* 424 F.Supp.2d at 440 (citing *Thompson,* 516 U.S. at 102, 116 S.Ct. 457). Absent either, non-*Mirandized* statements are admissible. *See id.* Interrogation consists of express questioning or its functional equivalent. *See id.* at 444 (citing *R.I. v. Innis,* 446 U.S. 291, 301–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). All of Tudoran's statements were in response to express questioning, and none were preceded by *Miranda* warnings. Thus, the sole question is whether he was in custody when he made the statements.

■ Normally, custody is established if, in light of the circumstances of an interrogation, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *See Yarborough,* 541 U.S. at 663, 124 S.Ct. 2140 (citation omitted). This "free to leave" test is an objective one that: "(a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses on the presence or absence of affirmative indications that the defendant was not free to leave." *U.S. v. Newton,* 369 F.3d 659, 669 (2d Cir.2004) (internal quotation marks and citation omitted). Because of the objective component, the test does not focus on the suspect himself, but rather on how a reasonable person in the suspect's shoes would perceive his circumstances. *See Yarborough,* 541 U.S. at 662, 124 S.Ct. 2140; *Newton,* 369 F.3d at 673 (citing *U.S. v. Ali,* 68 F.3d 1468, 1472 (2d Cir.1995)).

Here, the custody inquiry requires further elaboration because of the border. As the government asserts, various statutory rules and regulations govern the status and conduct of both those who seek admission, and those who control that admission. *See Gov't Memo.* at 5–7, Dkt. No. 14; *see also U.S. v. Malenge,* 1:06–CR–070, 2007 WL 332677, at *6 (N.D.N.Y. Feb.

6, 2007). Regardless of citizenship, everyone seeking entry must personally present themselves at a port of entry for inspection. When they do so, they are deemed to have arrived in the United States, they are designated as applicants for admission, and they must present satisfactory proof of their right to enter. Without satisfactory proof, an applicant who claims U.S. citizenship is subject to inspection as an alien. During the inspection process, authorities may ask questions concerning admissibility of both the person and his effects. *See U.S. v. Silva,* 715 F.2d 43, 47 n. 7 (2d Cir.1983) (citing 8 U.S.C. §§ 1225, 1357; 19 U.S.C. § 1582); *see also* 8 C.F.R. § 235.1. The same inspection protocol applies to those found in the United States regardless of whether they have presented themselves for primary inspection. *See* 8 U.S.C. § 1225(a)(1). If authorities determine that an applicant is inadmissible, they generally have three options: release him to the country of origin, detain him for administrative removal, or arrest him. *See Malenge,* at 274–75, 2007 WL 332677, at *6. Contingent on probable cause, an alien may be arrested if he avoids inspection or falsely claims U.S. citizenship. *See* 8 U.S.C. § 1325(a)(1); 18 U.S.C. § 911.

Although border authorities have broad Fourth and Fifth Amendment latitude, aliens are deemed to be in the United States and they are protected by the Fifth Amendment. *See, e.g., Wong Wing v. U.S.,* 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *see also Doherty v. Thornburgh,* 943 F.2d 204, 208 (2d Cir. 1991). Nonetheless, immigration rules and regulations permit border questioning as a routine and necessary predicate to enforcement of immigration laws. *See Silva,* 715 F.2d at 47; *U.S. v. Moody,* 649 F.2d 124, 127 (2d Cir.1981). Therefore, *Miranda* warnings are not initially required. *See Silva,* 715 F.2d at 46. Moreover, when citizenship is in doubt, additional question-

ing at secondary inspection does not transform an encounter into custodial interrogation. *See id.* The crucial question is: when does permissible border interrogation become custodial questioning for purposes of *Miranda?*

This Circuit has adopted the Fifth Circuit's formulation of the test: "*Miranda* warnings are required in border interrogations when the questioning of the official becomes an interrogation that is custodial in nature and is one in which 'information is sought for the purpose of using it against [a] person in a criminal proceeding.'" *Id.* at 47–48 (citing *Moody*, 649 F.2d at 127 (quoting *U.S. v. Henry*, 604 F.2d 908, 915 (5th Cir.1979))); *see also U.S. v. Kiam*, 432 F.3d 524, 530 (3d Cir. 2006) (*Miranda* warnings are required "[i]f the inspector's questions *objectively* cease to have a bearing on the grounds for admissibility and instead only further a criminal prosecution.") (emphasis added). Thus, as long as questioning is focused on either the admissibility of the individual or his possessions, rather than criminality, *Miranda* warnings are unnecessary.

The facts in cases that have applied the border standard are enlightening. In *Moody*, inspectors noticed that Moody was behaving nervously as she waited in a primary inspection line and that she appeared to have something secreted beneath her clothing. *See Moody*, 649 F.2d at 126. After she filled out a customs declaration and passed primary, she was stopped and questioned about her citizenship and foreign travel. *See id.* She was removed to a private room; her luggage was permissibly searched; a suspicious note was discovered; and an officer then felt a bulge and powdery substance beneath her clothing. *See id.* Moody then removed a plastic bag containing powder. *See id.* The officer asked what the package was, and Moody responded, "it is heroin." *Id.* From this sequence of events, the Circuit concluded that the last question violated *Miranda* because its purpose was to incriminate Moody. *See id.* at 128.

In *Silva*, Silva, accompanied by a traveling companion, was referred to secondary inspection because the primary inspector was dissatisfied with her answers concerning U.S. citizenship. *See Silva*, 715 F.2d at 45. At secondary and because of her slight Spanish accent, she was asked additional questions concerning her country of origin, place of birth, and foreign travel and purchases. *See id.* She produced a Texas driver's license as evidence of her citizenship. *See id.* Dissatisfied with her answers, inspectors removed her to an office and legally searched her purse. *See id.* In the purse, they discovered documents indicating that she was not a citizen and two bundles of currency wrapped in rubber bands. *See id.* Undeclared currency exceeding a specified threshold was a criminal offense, but the inspectors did not count the money. *See id.* at 44–45. They asked Silva about the money, and she replied that it belonged to her traveling companion and that she did not know the amount. *See id.* at 45. After the inspectors searched the traveling companion and found undeclared currency, they returned to Silva. *See id.* at 46. They provided her with a customs declaration, directing her to complete the questions. Silva wrote that she had no undeclared currency to report. *See id.* They then retrieved the money from her purse and advised her of her *Miranda* rights. *See id.* After she provided a post-*Miranda* statement, she was arrested for falsely claiming U.S. citizenship and falsely failing to disclose currency on the customs declaration. *See id.* From this sequence of events, the Circuit concluded that the pre-*Miranda* statements were the by-product of routine immigration and customs questioning, and *Miranda* warnings were unnecessary. *See id.* at 46–47. Despite the

detention and questioning, the inquiries focused on the admissibility of Silva and her effects. *See id.* at 47. Silva argued that because authorities had probable cause to arrest her for falsely claiming citizenship, they should have *Mirandized* her before asking that she complete the customs declaration. *See id.* Unpersuaded, the Circuit held that Silva's admissibility (citizenship) and the admissibility of her effects (customs declaration) were distinct inquiries, and the authorities were obligated by regulation to inquire about both.[2] *See id.* at 48. Although there was probable cause to believe that she lied about her citizenship, the customs declaration was part of the customs routine, and there was no probable cause to arrest for a customs offense absent completion of the declaration. *See id.* Thus, the Circuit implicitly requires that the court distinguish between persons and effects, and whether the probable cause inquiry remains extant as to either. Said otherwise in the context of *Silva,* once the authorities discovered the documents concerning Silva's foreign citizenship, further questions designed solely to incriminate her for falsely claiming citizenship would have been impermissible absent *Miranda* compliance. However, questions focused on her effects were permissible, presumably until probable cause to believe that she committed a customs offense was established, at which time *Miranda* warnings would have been required.

The court concurs with Judge Skretny's concern that questioning must have limits. *See U.S. v. Piggott,* 93–CR–199S, 1994 WL 228626, at *10 (W.D.N.Y. May 16, 1994). In the context of border control, this concern is exemplified when border officers, dissatisfied with the answers or evidence they generate, continue to interrogate beyond the bounds of the Constitution. However, by adding the Third Circuit's objective component to the analysis, *see Kiam,* 432 F.3d at 530, a court can establish the demarcation between permissible border questioning and impermissible custodial questioning just as it does in analogous interrogation contexts. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *U.S. v. DeLouya,* 1:04–CR–588, 2005 WL 3244173, at *12 (N.D.N.Y. Nov. 30, 2005).

Several principles drawn from both *Terry* stop and probable cause jurisprudence are relevant to the limits of border questioning. Both doctrines are analogous because *Miranda* does not apply to *Terry* questioning unless the stop is transformed into a custodial arrest. *See Yarborough,* 541 U.S. at 661–63, 124 S.Ct. 2140; *Thompson,* 516 U.S. at 102, 116 S.Ct. 457; *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). A stop requires reasonable suspicion, while an arrest requires probable cause. *See U.S. v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *Del. v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). A reasonable suspicion exists if there is a particularized and objective basis for suspecting criminal activity. *See Arvizu,* 534 U.S. at 273, 122 S.Ct. 744. Probable cause exists if, in light of the totality of the circumstances, the police have sufficient knowledge or reasonably trustworthy information to justify a reasonable person in believing that

---

**2.** When *Silva* was decided, ports of entry were staffed by both immigration and customs inspectors with separate responsibilities for aliens and effects. Today, those missions are joined under the Department of Homeland Security. Nonetheless, the admissibility of aliens and effects are still distinct inquiries.

While the Circuit emphasized the distinct responsibilities of agencies acting in tandem, this court emphasizes the importance of the separate inquiries themselves. *See U.S. v. Silva,* 715 F.2d 43 (2d Cir.1983); *compare U.S. v. Piggott,* 93–CR–199S, 1994 WL 228626, at *9 (W.D.N.Y. May 16, 1994).

an offense has been or is being committed. *See U.S. v. Gagnon*, 373 F.3d 230, 236 (2d Cir.2004) (citing *Ill. v. Gates*, 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Both are evaluated according to the facts known to the officer at the time, *see Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004), and the officer may draw inferences from his own experience. *See Ornelas v. U.S.*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Under the "fellow officer" rule, there is a presumption in a joint investigation that knowledge of one officer is attributable to all. *See Ill. v. Andreas*, 463 U.S. 765, 772 n. 5, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983); *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir.2003). A suspect's suspicious behavior may be attributable to his traveling companion. *See U.S. v. Tehrani*, 49 F.3d 54, 59–60 (2d Cir.1995).

When assessing the existence of probable cause, courts have traditionally cited various factors as probative, including: (1) lies and false information in response to questions, *see Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir.1997); *U.S. v. Garcia*, 179 F.3d 265, 269 (5th Cir.1999); (2) implausible, conflicting, evasive or unresponsive answers to questions, *see Garcia*, 179 F.3d at 269; *U.S. v. Carrillo*, 902 F.2d 1405, 1412 (9th Cir.1990); *U.S. v. Ameling*, 328 F.3d 443, 448–49 (8th Cir. 2003); *U.S. v. Martin*, 289 F.3d 392, 400 (6th Cir.2002); *U.S. v. Sholola*, 124 F.3d 803, 815 (7th Cir.1997); *U.S. v. Bizier*, 111 F.3d 214, 218 (1st Cir.1997); *U.S. v. Tarango–Hinojos*, 791 F.2d 1174, 1177 (5th Cir.1986); (3) furtive gestures or demeanor, *see Morales v. Artuz*, 281 F.3d 55, 60 n. 2 (2d Cir.2002); *Garcia*, 179 F.3d at 269; *U.S. v. West*, 219 F.3d 1171, 1178 (10th Cir.2000); (4) association with suspicious others, *see Tehrani*, 49 F.3d at 59; and (5) the particular area or other geographical factors pertinent to the encounter, *see Brinegar v. U.S.*, 338 U.S. 160, 177, 69

S.Ct. 1302, 93 L.Ed. 1879 (1949); *U.S. v. Davis*, 458 F.2d 819, 822 (D.C.Cir.1972).

Ultimately, police conduct must be objectively reasonable to withstand constitutional scrutiny, but the Supreme Court has cautioned that courts "should take care to consider whether the police are acting in a swiftly developing situation, and ... should not indulge in unrealistic second-guessing." *See U.S. v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *U.S. v. Gori*, 230 F.3d 44, 54–55 (2d Cir.2000).

With these principles in mind, the court turns to the encounter between Tudoran and the officers. Tudoran's muddy clothes, accent, and answers to the questions posed outside the cargo building engendered suspicions that he was not a U.S. citizen and might be in the country illegally. Nonetheless, he insisted that he was a citizen and provided a New York driver's license. The officers could not deny him admission if he was in fact a U.S. citizen. Given the circumstances, his initial ten minute detention and questioning, and his referral to secondary were objectively reasonable as a routine part of the inspection process. In any event, he does not seek suppression of these statements. (Collectively, Statement One).

■ Once inside the secondary building, Durant recognized Tudoran's name as that listed on the Canadian registration of the Gheorghiu vehicle and contemporaneously questioned him further about his citizenship. Tudoran again said that he was a U.S. citizen and bolstered that assertion by claiming he had traveled on a U.S. passport in the past. Although Tudoran's name on the registration escalated Durant's suspicion that Tudoran was not a U.S. citizen as he claimed, the questions were still a routine effort to discern Tudoran's alienage. The court cannot objectively conclude that there was probable cause to arrest him and that Durant's

questions had become incriminating in nature. Accordingly, *Miranda* warnings were not required, and Statement Two is admissible.

■ When Traistaru saw Tudoran, he had already discovered the altered green card bearing Tudoran's photograph. While the card was further indicia that Tudoran was associated with the vehicle, it did not unequivocally establish Tudoran's citizenship. Tudoran's answers to Traistaru's subsequent questions concerning ownership of the vehicle, recognition of Gheorghiu, and the green card were still an effort to discern Tudoran's alienage. The court cannot objectively conclude that absent evidence of Tudoran's citizenship, there was probable cause to arrest him for any offense. Therefore, the questions did not seek to incriminate Tudoran, *Miranda* warnings were not required, and Statement Three is admissible.

■ Viewing Tudoran's last comment in Statement Three ("you guys are good") in conjunction with the earlier suspicious circumstances, it is objectively reasonable to conclude that the remark was a tacit admission that Tudoran had avoided inspection by exiting the vehicle. In any event, that conclusion was certainly obvious when Gheorghiu told Traistaru that he had dropped Tudoran off before primary inspection and intended to pick him up on the U.S. side of the border. At that point, it was objectively reasonable to conclude that Tudoran had illegally entered the U.S. by evading inspection.

The court's conclusion is based on an evaluation of all of the circumstances, as impacted by the principles analogously drawn from *Terry* stop and probable cause jurisprudence. Thus, the only issue regarding Tudoran was his admissibility-not the admissibility of his effects. While the car may have been his and while the contents of the vehicle may have suggested criminal activity, the officers were not seeking to determine admissibility of his effects. However, because they were dissatisfied with his documentation and oral representations concerning U.S. citizenship, they were legally permitted to treat him as an alien applicant for admission.

By the time of Gheorghiu's statement that he dropped Tudoran off on the Canadian side of the border, the collective knowledge of the officers reasonably established that Tudoran and Gheorghiu were traveling companions. As such, information disclosed by Gheorghiu was attributable to Tudoran. In summary, they objectively knew: Tudoran resided in Montreal; he provided either conflicting accounts of his citizenship or lied about it outright; his picture was on false or altered identity documents; Gheorghiu dropped him off on the Canadian side of primary; Tudoran lied when he explained his presence in the unauthorized area; and his muddy clothes were consistent with having surreptitiously entered the United States. Thus, the officers had probable cause to arrest him for evading inspection.

While Tudoran continued to maintain that he was a U.S. citizen, the objective facts support the conclusion that probable cause existed to also charge him with falsely claiming citizenship. Regardless, that offense was simply one more that focused on the lawfulness of his admission. Thus, before Traistaru questioned Tudoran further (Statement Four), the encounter had become custodial in nature, additional questions were designed to elicit incriminating information, and *Miranda* warnings were required. Accordingly, Statement Four is suppressed.[3]

---

**3.** The court acknowledges some hesitation in reaching this conclusion because Traistaru was reacting to a swiftly developing situation, and his next questions followed his earlier conversation by only a few minutes. Nonetheless, the court does not believe it is indulg-

Given the court's suppression of Statement Four, it readily suppresses Statement Five because it was not preceded by *Miranda* warnings. Tudoran was handcuffed to a wall for three and one-half hours before Aubrey interrogated him, and there is no doubt that he was in custody.[4]

## B. *Due Process Voluntariness*

■ Statements comport with due process if they are voluntary, *see Dickerson v. U.S.*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), and the government must prove voluntariness by a preponderance of the evidence. *See Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). Voluntariness focuses on " 'whether a defendant's will was overborne 'by the circumstances surrounding the giving of a confession,' " *see Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326 (citation omitted), or stated differently, whether a statement is the "free and unconstrained choice of its maker." *Green v. Scully*, 850 F.2d 894, 900 (2d Cir.1988).

To determine voluntariness, the court must assess the totality of the circumstances surrounding the interaction between the police and suspect, including the police conduct, the conditions of interrogation, and the characteristics of the accused. *See Dickerson*, 530 U.S. at 434, 120 S.Ct. 2326; *Tankleff v. Senkowski*, 135 F.3d 235, 245 (2d Cir.1998). No single factor is dispositive. Instead, each case rests on the combination of its unique facts and an assessment of whether those facts reveal a statement involuntarily obtained by coercion. *See Green*, 850 F.2d at 902.

Police conduct includes physical abuse, psychological coercion, threats, material misrepresentations, or affirmative acts of trickery or deceit. *See U.S. v. Gaines*, 295 F.3d 293, 299 (2d Cir.2002); *U.S. v. Male Juvenile*, 121 F.3d 34, 41 (2d Cir.1997); *U.S. v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995); *U.S. v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995) (*per curiam* ). Characteristics of the accused include his experience, background, age, education, intelligence, and physical and mental state. Conditions of interrogation include whether *Miranda* warnings were provided (as necessary or not), the place of interrogation, its duration and conditions, the attitude of the police when conducting the interrogation, and the presence of counsel. *See McFarland*, 424 F.Supp.2d at 437 (citing *Colo. v. Spring*, 479 U.S. at 574, 107 S.Ct. 851); *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997); *Green*, 850 F.2d at 901.

In support of his motion, Tudoran filed an affidavit that articulated only two potential factors bearing on voluntariness, the absence of *Miranda* warnings and his subjective feelings of intimidation. Alone, the failure to *Mirandize* does not demonstrate coercion. *See McFarland*, 424 F.Supp.2d at 434, 434 n. 4 (citing respectively, *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326; *Harris v. N.Y.*, 401 U.S. 222, 226, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971)). As for Tudoran's subjective feelings, it is unlikely that they are pertinent to the volun-

ing in "unrealistic second-guessing," *see U.S. v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), especially since border questioning must have limits, and objectively, the officers had reached those limits.

**4.** Citing what are essentially exigent circumstance cases, the government argues that handcuffs alone do not denote custody. *See Gov't Supp. Memo., Dkt. No. 20.* The court is fully conversant with those cases, but they are factually distinguishable. The court's remarks during the hearing were not meant to suggest that handcuffs and custody are synonymous. Instead, the court intended to suggest that when an individual is restrained and handcuffed to a wall for three and one-half hours, there exists a persuasive inference that he is in custody. The government's citations do nothing to alter that view.

tariness inquiry. As the Supreme Court has said, "[a]bsent police conduct causally related to [a] confession, there is simply no basis for concluding that ... [they] ... deprived a criminal defendant of due process of law." *Colo. v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Thus, "... a defendant's mental condition, by itself and apart from its relation to official coercion [ ] should ... [never] ... dispose of the inquiry into constitutional 'voluntariness.'" *Id.* "We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause[.] ..." *Id.* at 167, 107 S.Ct. 515; *see also Connelly,* 479 U.S. at 174, 107 S.Ct. 515 (voluntariness of *Miranda* waiver governed by coercive police conduct); *U.S. v. Mathurin,* 148 F.3d 68, 69 (2d Cir.1998) (conclusory allegations insufficient to require a hearing regarding the voluntariness of statements).

Factually, there is nothing that occurred during the entire encounter suggesting that Tudoran was coerced to speak as a result of police conduct, the conditions of the interrogation, or the characteristics of Tudoran himself. Accordingly, none of the statements are involuntary, and the motion to suppress the statements on that basis is denied.

### C. *The Burden of Production: Entitlement to a Suppression Hearing*

Although the court has exercised its discretion and considered Tudoran's due process claim, it gratuitously addresses his burden of production as a precondition to his entitlement to a hearing.[5] In that regard, the court has previously explained the interplay between the Federal and local rules and a defendant's burden of production as it relates to this issue. *See generally U.S. v. Elliott,* 363 F.Supp.2d

439 (N.D.N.Y.2005); *Miller,* 382 F.Supp.2d 350; *DeLouya,* 2005 WL 3244173. The time is ripe to articulate the concept one last time before enforcement begins.

When a defendant seeks suppression of statements on the threshold issue of whether *Miranda* warnings were required, there are only two questions; namely, was he in custody, and did the police interrogate him? *See McFarland,* 424 F.Supp.2d at 440 (citing *Thompson,* 516 U.S. at 102, 116 S.Ct. 457). On these issues, the defendant bears the burden of production. *See Miller,* 382 F.Supp.2d at 361 (citing *Mathurin,* 148 F.3d at 69). He satisfies that burden if he alleges that he was subjected to custodial questioning without the benefit of *Miranda* warnings. *See Miller,* 382 F.Supp.2d at 362 (citing *Mathurin,* 148 F.3d at 69). Once he satisfies that burden, the court must conduct a hearing to determine whether the government can prove by a preponderance of the evidence that "there was no custodial interrogation implicating *Miranda,* there was some exception to the *Miranda* rule, or ... [the defendant] ... was properly *Mirandized* and waived his rights." *Miller,* 382 F.Supp.2d at 362 (citing *Lego,* 404 U.S. at 489, 92 S.Ct. 619; *U.S. v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991)). If a defendant fails to satisfy his burden of production, there will be no hearing, and the statements are admissible at trial. *See Miller,* 382 F.Supp.2d at 361.

To understand the burden of production regarding statements alleged to be involuntary under the Due Process Clause, it is imperative to recognize the fundamental distinction between such claims and those emanating from *Miranda* and its source, the Fifth Amendment's Self–Incrimination Clause. *Miranda* is a judicially created prophylactic rule designed to preclude the

---

**5.** The court's discretionary decision should not be interpreted as any intimation that Tu-

doran satisfied his burden of production. *See DeLouya,* 2005 WL 3244173, at *9 n. 2.

possibility of coercion, not coercion itself. *See McFarland,* 424 F.Supp.2d at 434. Therefore, a statement obtained in violation of *Miranda* will be suppressed as presumptively coerced even though the statement itself might be voluntary. *See id.* (citing *Dickerson,* 530 U.S. at 444, 120 S.Ct. 2326). *A fortiori,* a motion alleging custodial interrogation without *Miranda,* while sufficient to warrant a suppression hearing on that issue, is insufficient to warrant a hearing on voluntariness or coercion.[6]

Before a defendant is entitled to a suppression hearing and to compel the government to meet its burden of proof, he must meet his burden of production. Thus, as is evident from the court's preceding due process analysis, the defendant must allege police conduct, conditions of interrogation, or personal characteristics that raise an issue as to whether his will was overcome, and he was involuntarily compelled to speak.

Having identified the differing burdens of production regarding *Miranda* and due process claims, the question remains as to how a defendant can meet those burdens when he seeks a suppression hearing from this court. The court declines to restate all that it has previously said in that regard. *See generally Elliott,* 363 F.Supp.2d 439; *Miller,* 382 F.Supp.2d 350; *DeLouya,* 2005 WL 3244173. A simple summary will suffice.

Either of two methods is acceptable. Defense and government counsel can simply agree that a suppression hearing is necessary and communicate that agreement to the court. Communication can be by stipulation, letter or some other means. In the alternative, the defendant may file a formal motion. In either instance, it is a defendant who will inevitably seek suppression, and by local rule, he must consult with government counsel. Regardless of the method and depending upon the extent of their agreement, the parties must jointly or separately provide the court with the following: the extent to which they concur that the defendant has met his burden of production and is entitled to a suppression hearing and a recitation of the issues each party intends to raise at that hearing. When proceeding by agreement, the defense avoids the necessity of the affidavit required by local rule, but it does not avoid the necessity of articulating each basis upon which it seeks suppression. By the same token, the government must articulate each argument it intends to offer to counter the defendant's suppression arguments. Ultimately, the defendant must satisfy his burden of production, and if he fails to do so, the court may decline to conduct a hearing and deny the motion.[7]

As for Tudoran's motion, he initially sought an order pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure generically suppressing his statements. *See Tudoran Not. Mot., Dkt. No. 12.* In an accompanying legal memorandum, he argued custodial interrogation in the absence of *Miranda* warnings. He also argued that his statements were involuntary because he was not *Mirandized* and because he was "subjected to intensive, pressurized and threatening interrogation." *See Tudoran Memo. at 2, Dkt. No. 12.* He later supplemented his motion with an affidavit stating, *inter alia,* "I only answered questions because I felt intimidated by the officers." *Tudoran Aff. at ¶ 3, Dkt. No. 15.* There were no revela-

---

6. The court recognizes that the absence of *Miranda* warnings may be a *factor* in the analysis, but a *Miranda* failure alone is insufficient to demonstrate coercion. *See McFarland,* 424 F.Supp.2d at 434, 434 n. 4.

7. These same requirements and observations govern all motions to suppress.

tions concerning consultation between government and defense. In its response, the government opposed Tudoran's request for a hearing and observed that the motion was not supported by an affidavit.[8] *See Gov't Resp. at 1–2, 4, Dkt. No. 14.* The response then addressed the custodial interrogation aspects of the encounter, but it did not address voluntariness. On the basis of the defendant's submissions, the court elected to conduct a suppression hearing on both prongs of his motion.

 Because the court may be more restrictive when exercising its discretion in the future, it offers its views as to whether Tudoran satisfied his burden of production. As for his *Miranda* claim, he alleged facts sufficient to question whether custodial interrogation occurred without *Miranda* compliance. As for voluntariness, his affidavit was insufficient because, other than the failure to *Mirandize* and his subjective feelings of intimidation, it offered nothing to suggest coercion emanating from police conduct, the circumstances of the interrogation, or his personal characteristics.

## IV. *Conclusion*

Accordingly, and for the reasons stated herein, it is hereby

**ORDERED** that the motion of Daniel Tudoran (*Dkt. No. 12*) to suppress Statements designated as One and Six is **DENIED AS MOOT** because Tudoran has withdrawn his motion as to those Statements; and it is further

**ORDERED** that the motion of Daniel Tudoran (*Dkt. No. 12*) to suppress Statements designated as Two through Five as involuntary (Fifth Amendment Due Process Clause) is **DENIED;** and it is further

**ORDERED** that the motion of Daniel Tudoran (*Dkt. No. 12*) to suppress Statements designated as Two and Three as presumptively coerced because they were

obtained in violation of his *Miranda* rights (Fifth Amendment Self–Incrimination Clause) is **DENIED;** and it is further

**ORDERED** that the motion of Daniel Tudoran (*Dkt. No. 12*) to suppress Statements designated as Four and Five as presumptively coerced because they were obtained in violation of his *Miranda* rights (Fifth Amendment Self–Incrimination Clause) is **GRANTED.**

**SO ORDERED.**

---

8. Tudoran's affidavit was filed after the government's response.