United States Court of Appeals
Fifth Circuit

**F I L E D**

February 7, 2007

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

————————

No. 05-20549

————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JESUS NUNEZ-SANCHEZ,

Defendant - Appellant.

Appeal from the United States District Court
For the Southern District of Texas

Before KING, GARZA, and PRADO, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Jesus Nunez-Sanchez ("Nunez") is a citizen of Mexico who entered the United States illegally. Following a jury trial, he was convicted of four counts: alien in possession of ammunition, alien in possession of firearms, possession with intent to distribute cocaine, and possession of a firearm in furtherance of a drug trafficking crime. In this appeal, he challenges whether the arresting agents had probable cause, whether his confession was given voluntarily, and whether the evidence was sufficient to support the jury's conclusion that Nunez's possession of a firearm was in furtherance of a drug trafficking offense.

I

Agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") and the Bureau of Immigration and Customs Enforcement ("ICE") were investigating the purchase of firearms by illegal aliens at a gun show outside of Houston, Texas. One or two weeks prior to the gun show, ATF agent James Barger received a tip from a confidential informant who had previously provided reliable information. The informant told Agent Barger that he had spoken to individuals who were illegal aliens planning to purchase firearms at the gun show and that these individuals planned on purchasing the firearms without filling out the required paperwork. On the day of the gun show, the informant identified Nunez as an illegal alien attempting to purchase firearms.

As a result of the informant's tip, the agents closely followed Nunez and his companion, Adolfo Gerra-Sanchez ("Gerra"), for approximately an hour and a half. The two approached numerous gun dealers, but Agent Barger testified that they seemed to be avoiding dealers who required purchasers to complete ATF background check forms. When Nunez and Gerra did decide on a firearm to purchase, the agents watched as Nunez gave money to Gerra, who then purchased a .38 handgun. Agent Barger testified that this exchange looked like Gerra was acting as a "straw purchaser," where an eligible purchaser buys a firearm on behalf an ineligible purchaser. He further testified that the use of a "straw purchaser" is a common method used by illegal aliens to obtain firearms. At the point of sale, Gerra and Nunez did not fill out any paperwork. The agents also observed Gerra purchase a box of .9 mm ammunition before Nunez and Gerra left the gun show and headed to the parking lot.

Once in the parking lot, Nunez and Gerra walked toward their car and the agents noticed Nunez carrying what appeared to be the recently purchased box of ammunition. As Nunez and

2

Gerra got in their car, the agents approached them. ATF Agent Teneyuque said, "Stop, police. We just want to ask you a few questions. You're under arrest, and stop." Both she and Agent Barger had their guns drawn, though the agents kept them at their sides and did not point them at Nunez and Gerra. Agent Teneyuque told Nunez in English to drop the bag of ammunition. Because Nunez did not respond, Agent Teneyuque switched to Spanish and Nunez did drop the bag of ammunition. She then holstered her gun and identified herself as an ATF agent and said that they wanted to ask Nunez some questions. After Agent Teneyuque identified herself, her partner, ICE Agent Dirk Daniel, patted down Nunez and asked him for his name, place of birth, and immigration status. Nunez admitted that he had entered the country illegally.

At this time, Agent Teneyuque told Nunez in Spanish that he was under arrest and retrieved a Spanish waiver of rights form, which contained in Spanish the *Miranda* warnings and waiver section. She asked Nunez if he could read and write Spanish and he said he could. She then read the form to him. When she was done, she handed the form to him to read himself and asked if he understood his rights. He said that he did. She then asked if he was willing to waive his rights. He said that he was and signed the form waiving, at least for a time, his right to an attorney and right to remain silent.

After Nunez agreed to talk, Agent Teneyuque asked Nunez about his immigration status again, and he said he had illegally entered the country years ago. During the questioning that ensued, Nunez also admitted the firearm purchased at the gun show was for him. Nunez was then told that he was being placed under arrest; he was handcuffed and Agent Daniel removed Nunez's wallet and found 12 little bags of cocaine. Nunez admitted the cocaine belonged to him, but denied that he intended to sell the cocaine. Agent Teneyuque asked whether Nunez had any other firearms. Nunez said that he kept a rifle in his bedroom and, when asked, gave consent

3

to search the room. Before leaving the gun show to go to Nunez's apartment, Agent Teneyuque read to Nunez, in Spanish, the consent to search form, which Nunez signed.

Once they got to Nunez's apartment, the agents got consent to search Nunez's bedroom from the apartment's leaseholder. In the bedroom, there were two beds. Next to the headboard of Nunez's bed was a semiautomatic rifle standing upright. Under Nunez's bed, the agents found a box containing small bags of cocaine, totally 172.6 grams, numerous empty bags, and a bottle of baby laxative, which is often used to dilute cocaine thereby increasing the dealer's yield. This box of drugs and drug-related materials under the bed was about 18 to 24 inches from the rifle at the head of the bed. Under the other bed, there were 110 rounds of ammunition matching the rifle, within a couple of feet from the rifle.

After searching the bedroom, Agent Teneyuque brought Nunez into the kitchen were he provided both written and oral confessions. In the written confession, Nunez admitted to entering the country illegally, owning the rifle in the bedroom, and selling drugs for a contact from Colombia. Orally, he admitted to owning the drugs found in his room.

Following a jury trial, Nunez was convicted of alien in possession of ammunition, 18 U.S.C. §§ 922(g)(5) and 924(a)(2); alien in possession of firearms, 18 U.S.C. §§ 922(g)(5) and 924(a)(2); possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1) and (b)(1)(C); and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B). Nunez was sentenced to 123 months in prison.

II

A

First, Nunez challenges the district court's denial of his motion to suppress evidence. This challenge has two parts: whether the agents had probable cause at the time of the arrest and

4

whether his first confession to being an illegal alien, prior to receiving *Miranda* warnings, tainted the voluntariness of his confession after receiving the *Miranda* warnings.

"In an appeal from the denial of a motion to suppress, this Court reviews legal questions *de novo* and factual findings for clear error." *United States v. De Jesus-Batres*, 410 F.3d 154, 158 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1020-22 (2006). "In reviewing findings of fact, we view the evidence in the light most favorable to the party prevailing below." *United States v. Lopez-Moreno*, 420 F.3d 420, 429 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1449 (2006). The party prevailing below in this case was the government. "Also, the trial court's determination that the facts provided reasonable suspicion or probable cause is reviewed de novo. However, in carrying out this de novo review, we must 'give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* at 430 (citing *Ornelas v. United States*, 517 U.S. 690, 699 (1996)). Further, we "may affirm the district court's decision on any basis established by the record." *United States v. Charles*, 469 F.3d 402, 405 (5th Cir. 2006).

As an initial matter, we note that there is some question as to when Nunez was actually placed under custodial arrest. This issue is important to both aspects of the motion to suppress, since the agents must have had probable cause prior to placing Nunez under arrest and the agents must have given Nunez the *Miranda* warnings prior to interrogating him after placing him under arrest. The government argues that Nunez was not under arrest until he admitted to being an illegal alien. Nunez argues that he was placed under arrest when the agents approached the car with their guns drawn and began asking him questions prior to his admission to being an illegal alien. We need not settle when Nunez was actually placed under arrest, since even if we accept Nunez's contention that the arrest occurred when the agents initially approached him, we still affirm the district court's decision on both issues.

5

The agents must have had probable cause to believe that a crime was committed to arrest Nunez without a warrant. *See United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc) ("It is well established that under the Fourth Amendment a warrantless arrest must be based on probable cause."). "Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *United States v. Ramirez*, 145 F.3d 345, 352 (5th Cir. 1998). The police officer's knowledge must establish that there was a "'fair probability' that a crime occurred." *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999). "[T]he requisite 'fair probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *Id.* "When considering what a 'reasonable person' would have concluded, we take into account the expertise and experience of the law enforcement officials." *Id.* at 268.

Nunez argues that the agents lacked probable cause because his actions would only be a crime if he were an illegal alien and the agents had no reasonable basis for believing that he was an illegal alien. We agree with the district court in finding that the information known to the agents established a fair probability that Nunez was an illegal alien and, therefore, that a crime had been committed, namely possession of ammunition by an illegal alien.

The agents initially relied on an informant who identified Nunez as an illegal alien and stated that Nunez would attempt to purchase a firearm from a dealer who did not require an ATF background check. Although the basis of the informant's information is not on record, nor is there evidence of his reliability beyond Agent Barger's statement to that effect, the informant's information was specific and corroborated. *See Illinois v. Gates*, 462 U.S. 213, 244-45 (1983) ("It is enough, for purposes of assessing probable cause, that 'corroboration through other

6

sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'") (citing *Jones v. United States*, 362 U.S. 257, 269, 271 (1960)); *see also Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'") (citing *Alabama v. White*, 496 U.S. 325, 327 (1990)); *United States v. Roch*, 5 F.3d 894, 898 (5th Cir. 1993) ("Sometimes independent police work can corroborate details in an informant's tip."). Agent Barger observed Nunez and Gerra avoid retailers who required purchasers to fill out ATF forms, as the informant predicted. Further, he observed Nunez hand money to Gerra immediately before Gerra purchased the firearm, consistent with one method illegal aliens commonly use to obtain firearms. Between the informant's specific and corroborated information and Agent Barger's independent observations, the agents could establish a fair probability that Nunez was an illegal alien. Once the agents saw Nunez carrying what appeared to be the recently purchased box of ammunition, then there was a fair probability that Nunez was in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2), as an illegal alien in possession of ammunition. Although this fact was not confirmed until after the arrest took place, it need not be confirmed until after the arrest took place, so long as the information the agents relied on established a fair probability that a crime occurred. *See United States v. Garcia*, 179 F.3d 265, 269 n. 2 (5th Cir. 1999) ("[T]he function of arrest is not merely to produce someone in court for prosecution but also to enable a police officer who believes that the person has committed a crime to complete his investigation . . . .") (citing *United States v. Raborn*, 872 F.2d 589, 593 (5th Cir. 1989)). Therefore, we agree with the district court finding that there was probable cause to support the arrest.

Nunez next argues that his confession to being an illegal alien was not voluntary, even after he was given *Miranda* warnings, because he had previously been asked about his immigration status and admitted to being an illegal alien prior to receiving the *Miranda* warnings. Therefore, he seeks to suppress all testimony obtained as a result of his confession. The district court did suppress the first confession, as not in compliance with *Miranda*, but allowed the second confession since it came after the *Miranda* warnings were given.

Even assuming that Nunez was arrested at the time the agents approached him in the parking lot, the failure to provide *Miranda* warnings prior to the first inquiry into his immigration status did not make his post-warning confession involuntary. There are two Supreme Court cases setting the constitutional boundaries for such two-stage interrogations. In *Missouri v. Seibert*, 542 U.S. 600 (2004), a divided Court refused to allow the post-warning confession where a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring in judgment).[1] In that case, "[t]he unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill." *Id.* at 616 (plurality opinion). Both the four member plurality opinion and Justice Kennedy's concurring opinion distinguish the facts in *Seibert* from the facts in *Oregon v. Elstad*, 470 U.S. 298 (1985), where the Court allowed a post-warning confession even where the police had previously obtained a pre-warning confession, so long as the pre-warning confession was voluntary. *Id.* at 318. ("[T]here is no warrant for

---

[1] In *Missouri v. Seibert*, Justice Kennedy provided the fifth vote in a 5-4 decision, and decided the case on narrower grounds than the majority. "'It is well established that when we are confronted with a plurality opinion, we look to that position taken by those Members who concurred in the judgments on the narrowest grounds.' Therefore, we find *Seibert*'s holding in Justice Kennedy's opinion concurring in the judgment." *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (internal citations omitted).

presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary."). In *Elstad*, the police stopped by the suspect's home to inform his mother that he would be taken into custody for burglary. While one officer spoke to the mother, another officer told the suspect that he felt the suspect had committed the burglary. The suspect responded by admitting that he had been at the scene. Subsequently, the suspect was taken to the station, where *Miranda* warnings were administered and the suspect further confessed to the crime. The Court found that the pre-warning incident "had none of the earmarks of coercion," *id.* at 316, and likely resulted from confusion over when the suspect had been placed under custodial arrest. *Id.* at 315-16

We recently interpreted the relationship between *Seibert* and *Elstad* by stating, "*Seibert* requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, '[t]he admissibility of postwarning statements [] continue[s] to be governed by the principles of *Elstad*.'" *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (citing *Seibert*, 542 U.S. at 622) (modifications in original).

There is no evidence of a deliberate attempt to employ a two-step strategy in this case. As the district court found, there was nothing in the circumstances or the nature of the questioning to indicate that coercion or other improper tactics were used. All evidence suggests that Nunez was calm and cooperative, and the agents did not act with aggressiveness or hostility. The district court stated that "the defendant initially had done nothing more than voluntarily respond to questions as to his name, place of birth, and immigration status."

As a result, this case is governed by *Elstad*, under which "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the

9

finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Elstad*, 470 U.S. at 318. Nunez has alleged no facts indicating that coercive tactics were used in obtaining the second confession and all evidence suggests that the tone of the questioning was entirely conversational. In cases such as this, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* at 314. The agents here did administer the *Miranda* warnings prior to the second confession and Nunez is not alleging there was anything deficient about the manner in which the warnings were administered. Thus, we find that Nunez's second confession to being an illegal alien was voluntary and given with informed consent. The district court properly denied the motion to suppress the second confession.

B

Nunez also challenges the sufficiency of the evidence to support his conviction for possession of a firearm in furtherance of a drug trafficking offence, 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B), arguing that there was no evidence that he sold drugs at his home, where the firearm was found. Nunez was convicted after a jury trial, and "[t]he jury's verdict will be affirmed if any rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt. In conducting this inquiry, we must examine the evidence as a whole and construe it in the light most favorable to the verdict, drawing all reasonable inferences to support the verdict." *United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006) (internal citations omitted).

We have stated that "possession is 'in furtherance' of the drug trafficking offense when it

10

furthers, advances, or helps forward that offense." *United States v. Ceballos-Torres*, 218 F.3d 409, 410-11 (5th Cir. 2000). "This court considers a list of factors in determining whether a firearm is used 'in furtherance' of a drug-trafficking offense: (1) the type of drug activity being conducted; (2) the accessibility of the firearm; (3) the type of weapon; (4) whether the weapon is stolen; (5) whether the possession is lawful; (6) whether the firearm is loaded; (7) the weapon's proximity to drugs or drug profits; and (8) the time and circumstances under which the firearm is found." *Charles*, 469 F.3d at 406 (citing *Ceballos-Torres*, 218 F.3d at 414-15).

In this case, Nunez had in his bedroom 172.6 grams of cocaine under his bed, small bags to facilitate distribution, a cocaine dilutant, and over $2,000 in cash. The firearm was a semiautomatic assault rifle and was next to the bed, about two feet from the drugs. Although there is no evidence that the firearm was loaded or stolen, the firearm was illegally possessed and in the bedroom was a box of 110 rounds of ammunition matching the rifle and easily accessible. This evidence is enough for a rational juror to believe that the firearm was purposefully kept in a location where drug trafficking activities occurred, namely the storage and preparation of cocaine to be distributed. A rational juror could find that Nunez used the firearm to advance these drug trafficking activities. *See Ceballos-Torres*, 218 F.3d at 415.

III

For the foregoing reasons, we AFFIRM the district court's judgment.

11