In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-11-00073-CR
_____

**EDSON HEDIVALDO OLVERA-GARZA SR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 10-08-09235-CR**

**MEMORANDUM OPINION**

In this appeal, we address whether the trial court abused its discretion by admitting a defendant's oral and written confessions to a murder. The State charged Edson Hedivaldo Olvera-Garza Sr.[1] with murdering Eugene Villaruel. *See* Tex. Penal Code Ann. § 19.02 (West 2011). Before the trial began, Olvera asked the trial court to suppress his oral and written confessions to the murder. Olvera's

_____

[1]Appellant is also known as Edson Olvera. According to appellant, he usually goes by Edson Olvera.

1

motion to suppress asserts he was questioned by police while in their custody before being warned of his rights. The trial court denied Olvera's motion; afterward, under a plea bargain, Olvera pled guilty. In carrying out Olvera's plea agreement, the trial court sentenced Olvera to twenty-five years in prison.

## Custodial Interrogation

### *Standard of Review*

Generally, a *Miranda* warning is required if the police have taken a defendant into custody. *See Miranda v. Arizona*, 384 U.S. 436, 444, 478-79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (requiring that police advise a person of his rights prior to questioning if the person is in custody or has otherwise been deprived of his freedom of action in any significant way); *Herrera v. State*, 241 S.W.3d 520, 525-26 (Tex. Crim. App. 2007). To use the responses the defendant made during a custodial interrogation, the State must demonstrate that procedural safeguards—such as warnings—were used, which allow a defendant the opportunity to secure his privilege against self-incrimination. *Miranda*, 384 U.S. at 444; *Wilkerson v. State*, 173 S.W.3d 521, 526 (Tex. Crim. App. 2005).

On appeal, Olvera challenges the trial court's finding that his pre-*Miranda* interrogation was noncustodial. *See Miranda*, 384 U.S. at 445.[2] Olvera contends that he was in custody when, before receiving his *Miranda* warnings, he orally confessed to having been involved in Villaruel's murder.

A trial court's ruling on a motion to suppress is reviewed to determine whether the trial court abused its discretion in deciding to admit or exclude evidence. *See Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997). To determine whether the record supports the trial court's evidentiary ruling, we accord almost complete deference to the trial court's determination of historical facts, especially when that determination is based on the trial court's assessment of a witness's credibility and demeanor. *Id.* at 89. If the trial court's determination involves mixed questions of law and fact that turn on the trial court's evaluation of credibility and demeanor, the appellate court applies that same standard of "almost total deference[.]" *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000). Questions of law and fact that do not turn on credibility and demeanor are reviewed de novo. *Id*.

---

[2]The written warnings referred to in this opinion as *Miranda* warnings were those given to Olvera by the police in carrying out the duties placed on them by article 38.22 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.22 § 2 (West 2005).

*Summary of Testimony from the Suppression Hearing*

On November 2, 2008, Harris County Deputy Sheriff Ben Russell went to an apartment complex in Harris County to investigate a report that Villaruel was missing. Members of Villaruel's family told Deputy Russell that two men, Olvera and Edgar Sazo, had information about Villaruel's disappearance. While at the complex, the officers spoke with Olvera and Sazo; both denied knowing Villaruel's whereabouts. After Olvera and Sazo provided police with information that might be needed to contact them again, they were released.

Less than two hours later, after Montgomery County officers recovered Villaruel's body, Harris County officers went to Olvera's apartment. The officers did not arrest Olvera. After a pat-down search, the officers placed Olvera in handcuffs, put him in the backseat of a patrol vehicle, and took him to Villaruel's apartment complex, a distance of approximately four miles. According to Deputy Russell, department policy required the officers to use handcuffs as a precaution while transporting a person who was being detained in a police vehicle.

When Olvera arrived at Villaruel's apartment complex, Olvera's handcuffs were removed, and he was moved to the front seat of a detective's unlocked SUV. Detective Keith Echols, an officer employed by the Montgomery County Sheriff's Department, was standing outside the SUV. No one told Olvera he was under

4

arrest while he waited to be questioned. Shortly after arriving at Villaruel's apartment complex, Olvera was joined in the SUV by Detective Paul Hahs,[3] another officer with the Montgomery County Sheriff's Department. Initially, Olvera told Detective Hahs that he and Sazo had been with Villaruel that evening, but he claimed they had dropped Villaruel off at Villaruel's apartment around 10:00 p.m.

As the interview developed, Detective Hahs challenged Olvera to explain how Villaruel could have used his phone from Sazo's vehicle if he was no longer in Sazo's car; asked Olvera to explain when he cut his hand; and advised Olvera that they knew Villaruel had been murdered before telling Olvera that he believed Olvera "was directly involved or, excuse me, directly in the middle of this situation." During the course of their conversation, Olvera retracted his claim that he had no knowledge concerning Villaruel's murder. Olvera told Detective Hahs that "[Sazo] was planning to kill [Villaruel]" and he was "kind of trying to talk [Sazo] out of it."

Olvera went on to explain that he was driving Sazo's car when Sazo stabbed Villaruel. According to Olvera, Sazo asked him to help carry Villaruel's body into the woods, and he agreed to do so. After telling Detective Hahs that he helped Sazo

_____

[3]The detective's name is misspelled in the reporter's record as "Haas."

5

move Villaruel's body, and that blood had gotten on his clothing, Detective Hahs told Olvera that he would need his shoes. After taking Olvera's shoes, Detective Hahs asked: "Did [Sazo] make you stick [Villaruel] at all?" In response, Olvera admitted "I did in fact stab . . . like once or twice" while Villaruel was still alive. During the suppression hearing, Detective Hahs testified that he believed he had probable cause to arrest Olvera when Olvera agreed to give him his shoes and when Olvera admitted to having stabbed Villaruel.

After Olvera told Hahs about his involvement in Villaruel's murder, Detective Hahs asked Olvera to give a written statement. Olvera agreed. At that point, Detective Hahs asked Detective Echols for a "statement form[.]" Before getting the form, Detective Echols indicated that he wanted to ask Olvera some questions since he had not been present during the entire conversation. After Detective Echols finished questioning Olvera, and before giving Olvera his *Miranda* warnings, Detective Hahs asked Olvera if he had any blood on his clothes; he then asked Olvera to write out his statement.

During the suppression hearing, Olvera's counsel asked Detective Hahs when the interview became confrontational and when Olvera's statements became confessional. Detective Hahs stated he avoided using a confrontational tone when he told Olvera that his story did not match the facts. According to Detective Hahs,

6

his questions were designed to elicit truthful responses. Detective Hahs stated that when he told Olvera that his statement did not match known facts, he believed Olvera "was at the very least present when the murder occurred." According to Detective Hahs, the interview turned into a confession "[w]hen [Olvera] admitted that he stabbed [Villaruel]" because Olvera "wasn't admitting to any wrongdoing before then of his own." Detective Hahs stated he asked Olvera to provide a written statement because "[a]t that point I wanted him to back up what he was saying; and a lot of times people will say one thing, and when they put it on paper, they'll write something totally different, [giving] you inconsistencies to work with." Detective Hahs agreed that Olvera's written statement is consistent with his earlier oral statements.

*Trial Court's Findings of Fact and Conclusions of Law*

Trial courts are required to make written findings when a question is raised regarding the voluntariness of an accused's confession. Tex. Code Crim. Proc. Ann. art. 38.22 § 6 (West 2005). Nevertheless, "[a] trial court satisfies the requirements of Article 38.22 when it dictates its findings and conclusions to the court reporter," and the findings and conclusions are transcribed, filed with the district clerk, and included in the appellate record. *Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003).

7

The findings and conclusions the trial court dictated into the record at the conclusion of the suppression hearing in this case state:

- "[Olvera] was not in custody at the time that he gave his statement to the police[;]"

- "a person is brought into contact with the police, acting only upon a request or urging the police, and"

- "there is no threat expressed or implied that a statement was gonna be taken forcibly[,] when the statement's taken[,] that the statement is valid[;]" and

- "the statement was voluntary when it was given based upon the evidence of Detective [Hahs] and of the defendant."

- "So the statements [will] be allowed into evidence."

The trial court disregarded Olvera's request for further written findings. After the matter was appealed, Olvera complained the findings the trial court dictated to the court reporter failed to adequately address the issues he desired to raise on appeal. We remanded the case to the trial court, requiring that it make written findings of fact and conclusions of law to address the issues Olvera wished to raise in his appeal. *See* Tex. R. App. P. 44.4. Subsequently, the trial court made written findings; among its findings, the trial court found that:

- "Detectives [Hahs] and Echols are credible witnesses[;]"

- "The interview took place in the passenger cabin of Echols's marked patrol SUV[;]"

8

- "The doors were not locked and [Olvera] was free to leave[;]"

- "When [Hahs] began the interview, he did not believe [Olvera] was a suspect, but rather a witness[;]"

- "[Hahs] did not believe he had probable cause to arrest [Olvera], even after [Olvera] made incriminating statements[;]"

- "[Hahs's] manner was conversational and the questions asked were not a hostile interrogation[;]"

- "Echols stood outside the passenger side door, but did not block a potential exit for [Olvera;]"

- "Detectives never told [Olvera] that he was not free to leave, although they never told him that he was free to leave, either[;]"

- "[Hahs's] questions were calculated to get [Olvera] to implicate Sazo in the murder of Villaruel, not to get [Olvera] to implicate himself[;]"

- "Detectives believed they developed probable cause to arrest [Olvera] after he admitted to stabbing Villaruel[;]"

- "[Hahs] did not arrest [Olvera] after developing probable cause because [Hahs] believed the decision to arrest lay with Echols[;]"

- "After developing probable cause, [Hahs] continued speaking with [Olvera], but not about issues related to the case[;]"

- "[Hahs] read [Olvera] his *Miranda* rights and had [Olvera] execute a written [article] 38.22 waiver before taking his written statement. At that point, officers communicated to [Olvera] that they believed they had probable cause for his arrest and that he would be arrested[;]"

9

- "Officers did not inform [Olvera] that he was not bound by his oral statement before making his written statement[;]"

- "The total length of the interview was approximately one hour and fifteen minutes."

The trial court's conclusions of law include the following:

- "[Olvera] was not in custody when [Hahs] began to interview him in the police vehicle because the interview was not unduly long, he was not restrained in his movements to the degree associated with a formal arrest, and officers did not have probable cause to arrest him at the time. *See Stansbury v. California*, 511 U.S. 318, 322 (1994)[;]"

- "[Olvera] was not in custody when he made incriminating statements to the detectives about his involvement in the murder of Villaruel. *Id.*[;]"

- "[Olvera] was in custody when officers asked him to provide a written statement[;]"

- "[Hahs] did not deliberately employ a 'question first, warn later' approach to questioning because he did not deliberately begin a conversational, non-confrontational interview with [Olvera] with the intent of securing a confession without affording the appellant the protections of *Miranda* and [article] 38.22. *See Carter v. State*, 309 S.W.3d 31, 40-41 (Tex. Crim. App. 2010)[;]"

- "Echols did not deliberately employ a 'question first, warn later' approach to interviewing [Olvera]. He did not ask questions of [Olvera] with the intent of securing a confession without affording [Olvera] the protections of *Miranda* and [article] 38.22. *See Carter*, 309 S.W.3d at 40-41[;]"

10

- "The *Miranda*/[article] 38.22 warnings, when given, were effective at apprising [Olvera] of his rights and ensuring that those rights were protected. *See Martinez v. State*, 272 S.W.3d 615, 624 (Tex. Crim. App. 2008)[;]"

- "The officers did not employ any of the curative measures discussed in *Missouri v. Seibert*, 542 U.S. 600 (2004), because the officers did not believe that [Olvera] was in custody until he was asked to give a written statement[;]"

- "Because the officers did not deliberately use a 'question first, warn later' approach, curative measures were not necessary. *See Ervin v. State*, 333 S.W.3d 187, 213 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd)[;]"

- "The officers did not violate [Olvera's] Fifth Amendment rights in taking either his unwarned, oral statement, or his warned, written confession[;]"

- "[Olvera] was not entitled to the suppression of either statement."

*Challenged Findings*

Olvera specifically challenges the trial court's findings that "[w]hen [Hahs] began the interview, he did not believe [Olvera] was a suspect, but rather a witness[,]" and "[Hahs] did not believe he had probable cause to arrest [Olvera], even after [Olvera] made incriminating statements." These challenged findings are based on the trial court's judgments regarding Detective Hahs's and Detective Echols's credibility. Because trial courts have a first-hand opportunity to judge the demeanor of witnesses who appear in suppression hearings, appellate courts afford

11

"almost total deference" to the trial court's explicit findings of fact "as long as the record supports them[.]" *State v. Castleberry*, 332 S.W.3d 460, 465 (Tex. Crim. App. 2011).

In Olvera's case, the record contains evidence supporting the finding that Detective Hahs did not view Olvera as a suspect at the outset of the interview. Detective Hahs testified that Olvera was not in custody when the interview began and he interviewed Olvera to find out what happened because he thought Olvera might have some information about the murder. As the interview developed, Olvera advised Detective Hahs that he was with Sazo and Villaruel when Sazo murdered Villaruel, but in that account, Olvera took the position that he was merely a bystander who had not participated in Villaruel's murder. Thus, Detective Hahs could reasonably view Olvera's statements about having been with Villaruel when he was murdered as statements that did not incriminate Olvera in the crime.

Nevertheless, Detective Hahs acknowledged that he thought probable cause for an arrest developed during the interview when Olvera admitted that he had blood on his shoes and admitted that he had stabbed Villaruel. To the extent the trial court's finding reflects that Detective Hahs did not believe he had probable cause to arrest Olvera after Olvera gave Detective Hahs his shoes and admitted to

12

having stabbed Villaruel, the trial court's finding is not supported by the transcript of the hearing.

Olvera suggests the trial court was required to infer that Detective Hahs thought Olvera was a suspect in the murder at the outset of the interview. Viewing the interview from that point of view, which is one the trial court did not share, Olvera draws the conclusion that Detective Hahs conducted the interview intending to elicit an un-warned confession before administering *Miranda* warnings. Olvera directs us to a statement that Detective Hahs made before Olvera's interview began, which he contends indicates that Detective Hahs thought Olvera was present when Villaruel was murdered. But, we have explained that one of the positions that Olvera took in the course of his interview was that he was present but not a participant in Villaruel's murder. Based on the evidence, the trial court's determination that Hahs found that account believable is reasonable.

Olvera also points to the fact that Detective Hahs testified he did not believe Olvera's account about what happened on the night of Villaruel's murder. However, the fact that an officer has a hunch that a witness might have additional information than he had divulged does not necessarily mean the officer must also believe the witness is a suspect. The trial court found Detective Hahs did not view Olvera as a suspect at the outset of the interview, and we must apply a deferential

13

standard to our review of that finding. For instance, during the entire interview, Olvera and Detective Hahs spoke to each other calmly and in a conversational tone. Even though Detective Hahs pressed Olvera on inconsistencies and raised questions about Olvera's explanations, that technique was employed before Olvera divulged his involvement in Villaruel's murder. Also, pressing a witness on inconsistencies may be merely an attempt to get a witness to divulge all of the non-incriminatory information the witness knows. The trial court could reasonably view the interview as consistent with efforts to get Olvera to disclose Sazo's, not Olvera's, involvement in Villaruel's murder. In the light favorable to the trial court's role as factfinder, the trial court's conclusions that Olvera was not in custody when the interview began and that he was not in custody when he admitted being with Villaruel when Sazo stabbed him are supported by the record.

The question of what an officer intends by continued questioning after having been given incriminatory statements is subject to a "highly deferential review[.]" *Carter v. State*, 309 S.W.3d 31, 40 (Tex. Crim. App. 2010). Based on that standard, the record before the trial court allowed the trial court to conclude that Detective Hahs did not deliberately use a "question first, warn later" approach in questioning Olvera. The officers were involved in an interview process that moved fluidly from a noncustodial interrogation to one that became custodial when

14

Olvera incriminated himself in the murder. The trial court's finding that Hahs's questions were designed to get Olvera to implicate Sazo, not to get Olvera to implicate himself, as well as its conclusion that Detective Hahs did not employ a "question first, warn later" approach also find support in the record.

*Application of Law to Facts*

Olvera challenges the trial court's rulings to admit both his oral and his written statements. With respect to his oral statement, Olvera contends the trial court should have suppressed his entire oral statement as a pre-*Miranda* custodial statement. Determining when police have placed a defendant in custody is to be determined "on an ad hoc basis, after considering all of the (objective) circumstances." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996) (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)). In making that determination, courts are to determine whether a reasonable person, given all of the objective circumstances, would have perceived the detention to have been a restraint on movement "'comparable to . . . formal arrest[.]'" *State v. Ortiz*, 382 S.W.3d 367, 372 (Tex. Crim. App. 2012) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

Nevertheless, if the answers of the person being interviewed by police give the police probable cause to arrest the person being interviewed, an interview that

15

began as an investigative detention can change into a custodial interrogation. *See Dowthitt*, 931 S.W.2d at 255. Additionally, a noncustodial interrogation can become a custodial interrogation if, during the interview, the suspect's freedom to leave is restricted to the degree associated with an arrest and the restrictions on the suspect's movements are created by law enforcement officers, the suspect is told he cannot leave, or the police create a situation that would make a reasonable person who was innocent believe that his freedom of movement is significantly restricted. *Id.*

Olvera claims the police placed him in custody by handcuffing him, placing him in a police vehicle, and taking him to Villaruel's apartment complex. If not in custody when police initially took him to Villaruel's apartment complex, Olvera argues that the trial court should have found that he was in custody when he conceded that that he lied about the "events of the night of Villaruel's murder."

Olvera directs us to *Kaupp v. Texas*, arguing the facts involved in that case are similar to the facts in his case. *See* 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003). In *Kaupp*, a suspect implicated Kaupp in a murder; after being refused a search warrant, police went to Kaupp's home and awoke the seventeen-year-old Kaupp from his bed at 3:00 a.m. by shining a flashlight in his face. *Id.*, 538 U.S. at 628. After awakening Kaupp in his bedroom, the police told him: "'[W]e need to

16

go and talk.'" *Id.* Then, handcuffed and clothed only in his underwear, Kaupp was taken by police to the crime scene and then to the police station, where he was placed in an interrogation room and questioned. *Id.* On these facts, the Court held "[i]t cannot seriously be suggested that when the detectives began to question Kaupp, a reasonable person in his situation would have thought he was sitting in the interview room as a matter of choice, free to change his mind and go home to bed." *Id.* at 632.

*Kaupp* involved significantly different facts from the facts before us in Olvera's case, and we conclude it is easily distinguishable. In Olvera's case, the record reflects that earlier that same day, he was questioned about Villaruel's whereabouts and then released. Later, when police wanted to discuss the matter further, Olvera was not wakened by police in his home; instead, police called him while he was home; while fully clothed, he waited for the police outside his apartment. While *Kaupp* was interviewed in a police interrogation room, Olvera's was interviewed in the front seat of an unlocked vehicle.

Giving appropriate deference to the trial court's findings, the trial court's finding that Olvera was not in custody during his initial interview with Detective Hahs is supported by the record. The trial court could reasonably believe the testimony of Deputy Russell, who testified that Department policy required

17

persons being detained to be handcuffed while being driven to another destination for questioning. The trial court's conclusion that Olvera was not in custody when initially handcuffed is further reinforced by testimony that (1) Olvera's handcuffs were removed shortly after arriving at Villaruel's apartment complex, (2) the doors to the SUV Olvera occupied were not locked during the course of the interview, and (3) Olvera was not told while at his apartment complex or after arriving at Villaruel's complex that he was being arrested. We conclude the record supports the trial court's conclusion that Olvera's movement was not significantly restricted to the degree associated with an arrest when his interview with Detective Hahs began. *See State v. Sheppard*, 271 S.W.3d 281, 289 (Tex. Crim. App. 2008) (explaining that the use of handcuffs does not automatically convert a temporary detention into a Fourth Amendment arrest).

We also are not persuaded that custody arose when Olvera contradicted his statement that he dropped Villaruel off around ten o'clock that evening. Although Olvera and Sazo were the immediate focus of the investigation, Detective Hahs told Olvera early during his interview that police were in the process of gathering information, and Detective Hahs testified that he did not have probable cause for an arrest when his interview with Olvera began. The record also does not demonstrate that Detective Hahs communicated the existence of probable cause to

18

Olvera when the interview began. Even though Olvera and Sazo were the focus of the investigation during their interviews, being the focus of an investigation, without more, is not sufficient to elevate an investigative detention to a custodial interrogation; the suspect's freedom of movement must still be restricted to the degree associated with a formal arrest. *Gardner v. State*, 306 S.W.3d 274, 293-94 (Tex. Crim. App. 2009), *cert. denied*, 131 S.Ct. 103, 178 L.Ed.2d 64, 79 U.S.L.W. 3197 (2010). We conclude the trial court, on the record before it, could reasonably conclude that Olvera's interview began as an investigative detention rather than as a custodial interrogation.

Alternatively, Olvera argues that custody attached in the course of his interview with Detective Hahs. Sometimes, depending on the circumstance, a consensual inquiry may escalate into custodial interrogation. *See Dowthitt*, 931 S.W.2d at 255 ("[T]he mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation."). Although the manifestation of probable cause does not automatically establish custody, "custody attaches if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Garcia v. State*, 237 S.W.3d 833, 837

19

(Tex. App.—Amarillo 2007, no pet.). Circumstances relevant in determining whether a person is "in custody" include (1) the location where the person is questioned, (2) the duration of the questioning, (3) the statements that are made during the interview, (4) the presence or absence of physical restraints when the person is questioned, and (5) whether the person is released at the end of the interview. *Howes v. Fields,* 132 S.Ct. 1181, 1189, 182 L.Ed.2d 17, 80 U.S.L.W. 4154 (2012).

Like the objective facts that were before the Court in *Dowthitt*, Olvera's case includes a pivotal admission. *See Dowthitt*, 931 S.W.2d at 256; *see also Ruth v. State*, 645 S.W.2d 432, 435 (Tex. Crim. App. 1979) (determining that suspect was in custody from the moment he admitted to committing the shooting); *Xu v. State*, 100 S.W.3d 408, 414 (Tex. App.—San Antonio 2002, pet. ref'd). In Olvera's case, Olvera's pivotal admission revealed that he had been a participant in Villaruel's murder. When Olvera admitted he moved Villaruel's body, Olvera was inside a patrol car, he was within short distance of several police officers, and he was at a location several miles from his home. Additionally, when Olvera admitted facts indicating he had become involved in Villaruel's murder, a detective was positioned near the SUV. When Olvera's pivotal admission occurred, Detective Hahs did not tell Olvera that he was free to terminate the interview and leave.

20

Olvera's admission that his participation included moving Villaruel's body is an objective circumstance showing that, at that point in the interview, no reasonable person would still believe he remained free to leave.

Immediately after advising Detective Hahs that he helped move Villaruel's body, police failed to give Olvera his *Miranda* warnings. At that point, because Olvera told police his involvement included moving Villaruel, probable cause was manifest. For Fifth Amendment purposes, we conclude that Olvera was in custody when he told Detective Hahs that he helped Sazo move Villaruel's body. *See Dowthitt*, 931 S.W.2d at 256-57.

*Delayed Warnings*

Olvera contends his written statement should have been suppressed even though he made it after receiving *Miranda* warnings. According to Olvera, Detective Hahs deliberately delayed giving *Miranda* warnings to secure a written confession. *See Missouri v. Seibert*, 542 U.S. 600, 608-09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion). The State argues the trial court could reasonably find that any *Miranda* violation resulted from Detective Hahs's mistaken belief that Olvera was not in custody until the warning was given; the State concludes that Olvera's written confession remains one that he gave police voluntarily. *See Oregon v. Elstad*, 470 U.S. 298, 318, 105 S.Ct. 1285, 84 L.Ed.2d

21

222 (1985) (holding that a person who provides incriminating information may, in certain circumstances, still provide a voluntary confession after receiving *Miranda* warnings).

Olvera's argument relies on *Seibert*, which applies to two-step interrogations involving deliberate police misconduct. *Carter*, 309 S.W.3d at 37-38. If an officer intended to employ a "question first, warn later" interrogation technique in a deliberate effort to circumvent a suspect's *Miranda* protections, the effectiveness of a mid-stream *Miranda* warning is evaluated from a totality-of-the-circumstances inquiry, and from the perspective of a reasonable person in the suspect's shoes, irrespective of the officer's intent. *Id.* at 37. When conducting the review required by *Seibert*, a highly deferential review is applied in reviewing the trial court's determination on the question of whether an officer deliberately employed a "question first, warn later" technique to circumvent a suspect's right to be warned of his constitutional right against self-incrimination. *Id.* at 39-40.

When officers use a two-step interrogation technique in a calculated way to undermine *Miranda* warnings, the post-warning statements must be excluded unless curative measures are taken before the post-warning statement is made. *See Martinez v. State*, 272 S.W.3d 615, 626 (Tex. Crim. App. 2008) (citing *Seibert*, 542 U.S. at 619 (Kennedy, J., concurring)). According to Olvera, *Martinez*

22

supports his claim that the trial court should have suppressed his written confession. In *Martinez*, police arrested Martinez on a warrant, and he then gave both of the statements at issue at the police station. *Id.* at 617-18. Under those facts, the Texas Court of Criminal Appeals concluded that the absence of *Miranda* warnings at the beginning of Martinez's interrogation was not the result of a mistaken belief that he was not in custody. *Id.* at 617-18, 626-27.

Olvera's case is distinguishable. Olvera was not interviewed at the station. Although Detective Hahs communicated his view that he believed Olvera was "right smack in the middle of it," that statement occurred before Villaruel was in police custody. Our facts also involve numerous trial court findings, entitled to deference, that favor the view that Detective Hahs did not consider Olvera to be in police custody during the majority of the interview. Additionally, in this case, after Olvera admitted his involvement in Villaruel's murder, Detective Hahs presented Olvera with a written confession form and warned him that he had certain rights, such as the right to counsel. While some interrogation occurred between the point that custody attached and the point that Olvera received his *Miranda* warnings, and that part of the questioning constitutes a violation of Olvera's *Miranda* rights, a *Miranda* violation, in and of itself, does not require a trial court to automatically

23

suppress a statement made subsequent to the suspect being provided *Miranda* warnings. *See Carter*, 309 S.W.3d at 36.

However, that portion of the interview that occurred after Olvera admitted his involvement in the murder and before Olvera was given his *Miranda* warnings are required to be suppressed. After probable cause arose for Olvera's arrest, Detectives Hahs and Echols questioned Olvera for approximately six minutes before warning Olvera about his right to remain silent. Nevertheless, during that six minute period, the interview remained conversational, Olvera remained calm and cooperative, and the detectives did not direct any aggressive or threatening behavior toward him. *See id.* at 40.

After warning Olvera of his *Miranda* rights, Detective Hahs asked that Olvera write down what Olvera told him about the matter. The trial court could reasonably view Detective Hahs's request as a request and not a command; that interpretation of Detective Hahs's request is consistent with the fact that Detective Hahs left Olvera while he wrote out his statement and the fact that Olvera's written statement contains significant additional detail to the information Olvera had disclosed to the detectives orally.

Although a six minute custodial interrogation is longer than the one before the Court of Criminal Appeals in *Carter,* that Court also stated that "[w]here the

totality of these facts fall on the *Elstad-Seibert* continuum, though, is a question on which reasonable minds may disagree." *Id.* at 41. We conclude that reasonable minds may disagree given the circumstances before the court here; nevertheless, the trial court's determination, given the fact that the trial court is in a better position to evaluate whether the officers intended to undermine Olvera's *Miranda* rights, is a matter on which the trial court is entitled to our deference. In this case, the trial court found that Olvera was not in custody before he received *Miranda* warnings. Although we disagree with the trial court's legal conclusion about the precise moment when custody attached, the trial court also found that Detective Hahs did not deliberately employ a question first and warn later approach. *See Tucker v. State*, 369 S.W.3d 179, 184 (Tex. Crim. App. 2012) ("In reviewing a trial court's ruling on a motion to suppress, appellate courts must afford great deference to the trial court's findings of historical facts as long as the record supports those findings."). The trial court also found that Detectives Hahs was a credible witness, and given the fact that the trial court had an opportunity to observe the witnesses who testified during the hearing, the trial court's findings that revolve around questions of credibility are "especially relevant to a deliberateness determination." *Carter*, 309 S.W.3d at 40. After carefully reviewing the record, we cannot say that the trial court's rejection of Olvera's argument that police deliberately attempted to

prevent Olvera's effective exercise of his *Miranda* rights is implausible, or that the trial court's decision is unsupported by the record. *Id.* at 41.

Olvera also challenges the trial court's decision to admit his written statement. He contends that his warned written statement must be suppressed as involuntary. *See Elstad*, 470 U.S. at 316-18. "Once a determination has been made that the pre-warning questioning was not part of a deliberate plan to undermine a suspect's *Miranda* protections, it is still necessary to determine if appellant's post-warning statements were voluntarily made." *Carter*, 309 S.W.3d at 41.

A *Miranda* violation alone does not establish that a statement made after the suspect receives belated *Miranda* warnings is involuntary. The United States Supreme Court has stated: "It is an unwarranted expansion of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Elstad*, 470 U.S. at 309.

Many of the trial court's unchallenged findings support the conclusion that Olvera's written statement, made after he was given *Miranda* warnings, was voluntary. Olvera does not challenge the trial court's findings that (1) "[Hahs's]

manner was conversational and the questions asked were not a hostile interrogation[;]" (2) "Echols stood outside the passenger side door, but did not block a potential exit for [Olvera;]" (3) "Detectives never told [Olvera] that he was not free to leave, although they never told him that he was free to leave, either[;] (4) "[Hahs's] questions were calculated to get [Olvera] to implicate Sazo in the murder of Villaruel, not to get [Olvera] to implicate himself[;]" and (5) "there is no threat expressed or implied that a statement was [going to] be taken forcibly[.]" As the record of the hearing supports these findings, they are entitled to our deference. *Tucker*, 369 S.W.3d at 184.

In support of his argument that his written statement should be suppressed, Olvera relies on *Jones v. State*, 119 S.W.3d 766 (Tex. Crim. App. 2003). In *Jones*, the Court of Criminal Appeals distinguished *Elstad* and suppressed a written confession that police took in an uninterrupted and continuous process after they obtained an unwarned custodial oral statement. *Id*. at 775. The Court of Criminal Appeals noted that Jones did not make a second statement, but simply signed a written statement that he dictated to the officer before he was warned. *Id.* Here, after being warned about his rights, Olvera provided police with a statement written in his own hand, adding details of the murder to those details he previously provided orally. In our opinion, *Jones* is distinguishable by the totality-of-the-

27

circumstances that surround how police obtained Olvera's warned statement. *See id.*

Because Olvera was given *Miranda* warnings before giving his written statement, the facts before us are more like the facts before the Court in *Carter*. In upholding the trial court's determination that pre-warning custodial interrogation did not require suppression of a post-warning statement, the Court of Criminal Appeals held that "'[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement [may] suffice to remove the conditions that precluded admission of the earlier statement.'" *Carter*, 309 S.W.3d at 42 (citing *United States v. Nunez-Sanchez*, 478 F.3d 663, 669 (5th Cir. 2007)). In *Carter*, the officer administered appropriate warnings prior to further questioning. *See id.* The Court of Criminal Appeals held the defendant's confession, given after he received warnings, satisfied the *Elstad* standard notwithstanding the earlier *Miranda* violation. *Id.*

Here, the trial court's finding that Detective Hahs did not deliberately employ a "question first, warn later" interrogation technique is supported by the record and Detective Hahs administered appropriate *Miranda* warnings prior to further questioning. The record of the suppression hearing also supports the trial court's finding that threat and coercion were not used in procuring Olvera's

confession. On the facts in this case, the officer's failure to administer warnings earlier than they administered them, unaccompanied by circumstances that were calculated to undermine Olvera's exercise of his free will, did not so taint the investigatory process that it made the warnings he received ineffective; thus, Olvera's subsequent written confession was both voluntary and informed. *Elstad*, 470 U.S. at 309. On this record, we conclude the trial court was free to find that Olvera's post-warning written statement was admissible. *See id*; *Carter*, 309 S.W.3d at 42.

*Unwarned Oral Custodial Statement*

Although we have concluded the trial court ruled correctly that Olvera's post-warning written statement was admissible, we reach a different conclusion regarding Olvera's unwarned custodial statements taken in violation of *Miranda.* Statements taken in violation of *Miranda* are presumptively inadmissible. *See Elstad*, 470 U.S. at 307. The trial court determined that custody commenced at the point when Detective Hahs asked Olvera if he would give a written statement; however, in our opinion, Olvera was in custody from the point he told Detective Hahs that he had helped Sazo move Villaruel's body. *See Dowthitt*, 931 S.W.2d at 256-57. After that point, Olvera stated blood had gotten on his clothing, and he admitted that he had stabbed Villaruel. After Detective Hahs asked Olvera if he

29

would give a written statement, and still before warning him of his rights, Olvera told police that he and Sazo were the only two people involved in the murder, identified the car he had been driving, denied having gone to a party on the night of the murder, informed the detectives of his whereabouts that night, and described the clothing he had been wearing. Although the trial court found that these matters were not issues related to the case, the record demonstrates otherwise. As these statements were made after Olvera was in custody and before he was given *Miranda* warnings, the trial court was required to grant Olvera's request to suppress them. *See Elstad*, 470 U.S. at 307 ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.")

*Harm*

Having found that it was error to admit some of the testimony at issue, the standard of review requires that we reverse the judgment unless we determine, beyond a reasonable doubt, that the constitutional error did not contribute to Olvera's conviction or punishment. *See* Tex. R. App. P. 44.2(a). We do not focus on the propriety of the outcome, but calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). In the context of a plea-bargain case, we

30

consider whether the erroneous ruling contributed in some measure to the State's leverage in the plea bargaining process. *See Holmes v. State*, 323 S.W.3d 163, 174 (Tex. Crim. App. 2010) (op. on reh'g). Nevertheless, a conviction following a guilty plea should not be overturned "when the evidence was of little importance in obtaining the conviction." *State v. Chupik*, 343 S.W.3d 144, 148 (Tex. Crim. App. 2011) (citing *Gonzales v. State*, 966 S.W.2d 521, 524 (Tex. Crim. App. 1998); *Kraft v. State*, 762 S.W.2d 612, 615 (Tex. Crim. App. 1988); *McGlynn v. State*, 704 S.W.2d 18, 21 (Tex. Crim. App. 1982) (op. on reh'g)).

Additionally, in assessing harm, we consider whether the improperly admitted evidence was cumulative of other, properly admitted evidence. *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). For instance, in *Townsend v. State*, the defendant pled guilty after the trial court overruled the defendant's motion to suppress both the in-court and out-of-court identifications. 853 S.W.2d 718, 720 (Tex. App.—Houston [1st Dist.] 1993, no pet.). The Court of Appeals held the error, if any, in denying the motion to suppress the out-of-court identification was harmless in light of the properly admitted in-court identification. *Id.*

Here, most of the evidence challenged by Olvera's motion to suppress was admissible. Olvera accepted the State's plea bargain offer and pled guilty on the

31

strength of his oral and written confessions. Olvera received effective *Miranda* warnings before giving his written statement, and Olvera's written statement described in more precise detail the information Olvera gave police in his unwarned custodial oral statement. Had the statements Olvera made after he told Detective Hahs that he helped move Villaruel's body been suppressed, the State could still have used Olvera's detailed written statement, as well as all of Olvera's oral statements up to the point that he was in custody during any subsequent trial.

We conclude that the admissible evidence available to the State in Olvera's case was sufficient to secure Olvera's conviction. We further conclude that the inadmissible statements were of little importance with regard to the State's leverage in obtaining the plea bargain at issue. Because the inadmissible evidence did not contribute to the State's bargaining position, we conclude, beyond reasonable doubt, that the trial court's failure to grant the motion to suppress Olvera's unwarned custodial oral statements did not contribute to Olvera's conviction or to his punishment. *See Townsend*, 853 S.W.2d at 720. We overrule the appellant's issues and affirm the trial court's judgment.

AFFIRMED.

                                        _____
                                                HOLLIS HORTON
                                                    Justice

Submitted on September 28, 2012
Opinion Delivered April 24, 2013
Do Not Publish

Before Gaultney, Kreger, and Horton, JJ.